## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, *et al.*,[1] | Case No. 18-10601 (MFW) |
| Debtors. | Jointly Administered |
| ------------------------------------------------------- | |
| In re: | Adv. Proc. No. 18-50486 (MFW) |
| AI INTERNATIONAL HOLDINGS (BVI) LTD., | **BRIEF IN SUPPORT OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| -against- | |
| MUFG UNION BANK, N.A.; as administrative and collateral agent and UNIONBANCAL EQUITIES, INC. | |
| Defendants. | |

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases ("Debtors"), which are being jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://dm.epiq11.com/twc.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

NATURE AND STAGE OF PROCEEDING .........................................................................3

SUMMARY OF ARGUMENT ..............................................................................................4

STATEMENT OF FACTS ......................................................................................................7

    I.    THE DEFENDANTS' LIENS ARE NOT SUBJECT TO A BONA FIDE
          DISPUTE. ............................................................................................. 7

    II.   THE FINAL DIP ORDER EXPRESSLY PROVIDES THE DEFENDANTS
          WITH A BARGAINED-FOR SET OF RIGHTS. ......................................... 9

    III.  THE PLAINTIFF PARTICIPATED FULLY IN THE SALE PROCESS AND
          DID NOT CONTEST, OR AT THE VERY LEAST ACQUIESCED TO, THE
          DEFENDANTS' PURCHASE PRICE ALLOCATION, WHICH WAS
          APPROVED BY FINAL ORDER OF THE COURT. ................................. 13

ARGUMENT .........................................................................................................................19

    I.    THE SALE ORDER AND THE FINAL DIP ORDER ARE FINAL ORDERS
          THAT ARE NOT SUBJECT TO COLLATERAL ATTACK. .................................. 19

    II.   THE PLAINTIFF LACKS STANDING TO BRING ANY OF THE CLAIMS
          ASSERTED IN THE COMPLAINT. ........................................................... 32

    III.  COUNTS III AND IV ARE ALSO MOOT OR OTHERWISE BARRED
          BECAUSE THE DEFENDANTS' CLAIMS ARE ALLOWED UNDER THE
          FINAL DIP ORDER, THE DEBTORS AMENDED THEIR SCHEDULES,
          AND THERE IS NO BAR DATE ESTABLISHED IN THESE CASES ................. 36

    IV.  COUNTS V AND VI ARE ALSO MOOT OR OTHERWISE BARRED
          BECAUSE THE PLAINTIFF IS PRECLUDED BY THE COURT'S
          ORDERS FROM SEEKING DISGORGEMENT FROM THE
          DEFENDANTS. ...................................................................................... 37

CONCLUSION……………………………………………………………………………38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 11 E. 36th LLC,*
No. 13-11506 (JLG), 2016 WL 152924 (Bankr. S.D.N.Y. Jan. 12, 2016)......20, 28, 30, 31, 32

*ACLU-NJ v. Twp. of Wall,*
246 F.3d 258 (3d Cir. 2001).................................................................................32

*Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.),*
762 F.2d 185 (2d Cir. 1985).................................................................................20

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).............................................................................................19

*In re Brooks Sand & Gravel, LLC,*
361 B.R. 477 (Bankr. W.D. Ky. 2007) ........................................................... 28-29

*In re Centaur, LLC,*
No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ......................... 26-27

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).............................................................................................33

*Constitution Party of Pa. v. Aichele,*
757 F.3d 347 (3d Cir. 2014).................................................................................33

*CoreStates Bank, N.A. v. Huls Am., Inc.,*
176 F.3d 187 (3d Cir.1999)..................................................................................20

*In re DSI Renal Holdings, Inc.,*
574 B.R. 446 (Bankr. D. Del. 2017) .....................................................................27

*In re Emoral, Inc.,*
740 F.3d 875 (3d Cir. 2014).................................................................................27

*In re Exide Techs.,*
303 B.R. 48 (Bankr. D. Del. 2003) ................................................................... 26-27

*In re Flintkote Co.,*
486 B.R. 99 (Bankr. D. Del. 2012) ...........................................................32, 33, 34, 36

*Hassan v. City of New York,*
804 F.3d 277 (3d Cir. 2015).................................................................................33

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005) ........................................................................ 36-37

*Hubicki v. ACF Indus., Inc.*,
    484 F.2d 519 (3d Cir. 1973) ............................................................................... 19

*I.R.S. v. Patriot Contracting Corp.*,
    No. 06-2133 (JLL), 2007 WL 433392 (D. N.J. Feb. 7, 2007) ......................... 28-29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................... 32, 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................... 19

*In re Mariner Post-Acute Network, Inc.*,
    267 B.R. 46 (Bankr. D. Del. 2001) ..................................................................... 20

*Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*,
    726 F.3d 387 (3d Cir. 2013) ............................................................................... 20

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994) .......................................................................... 36-37

*In re Mullins*,
    No. 16-11032 (BLS), 2017 WL 3705071 (Bankr. D. Del. Aug. 24, 2017) ............................ 19

*In re Newpage Corp.*,
    517 B.R. 508 (Bankr. D. Del. 2014) ................................................................... 19

*In re Nortel Networks, Inc.*,
    531 B.R. 53 (Bankr. D. Del. 2015) ................................................................. 36-37

*Official Comm. of Equity Security Holders v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*,
    371 B.R. 660 (S.D.N.Y. 2007) ...................................................................... 26-27

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) ........................................................................... 19-20

*In re Pardee*,
    218 B.R. 916 (B.A.P. 9th Cir. 1998) ............................................................... 19-20

*In re Patriot Contracting Corp.*,
    No. 05-33190 DHS, 2006 WL 4452840 (Bankr. D.N.J. Mar. 28, 2006) ........................... 28-29

*Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*,
    816 F.3d 273 (4th Cir. 2016) .................................................................... 22, 23, 24

*Roberts v. White*,
   698 F. Supp. 2d 457 (D. Del. 2010)........................................................................20

*In re SAI Holdings Ltd.*,
   No. 06-33227, 2012 WL 3201893 (Bankr. N.D. Ohio Aug. 3, 2012)..................28, 29, 30, 31

*Spartan Mills v. Bank of Am. Ill.*,
   112 F.3d 1251 (4th Cir. 1997) ...........................................................................28

*Taliaferro v. Darby Twp. Zoning Bd.*,
   458 F.3d 181 (3d Cir. 2006).............................................................................36

*In re Target Indus., Inc.*,
   328 B.R. 99 (Bankr. D. N.J. 2005) ....................................................................28, 29, 32

*In re Tennessee Valley Steel Corp.*,
   183 B.R. 795 (Bankr. E.D. Tenn. 1995) .............................................................. 26-27

*In re The IT Grp., Inc.*,
   322 B.R. 729 (Bankr. D. Del. 2005) ....................................................................22

*In re TK Holdings Inc.*,
   No. 17-11375 (BLS), 2018 WL 903980 (Bankr. D. Del. Feb. 14, 2018) ..............................19

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012)...............................................................................32

*Winget v. JP Morgan Chase Bank, N.A.*,
   537 F.3d 565 (6th Cir. 2008) ..........................................................................22, 23, 24

**STATUTES**

11 U.S.C. § 521(1) .............................................................................................. 36-37

11 U.S.C. § 1109(b) ............................................................................................32

**RULES**

Fed. R. Bankr. P. 3003(b)(1).............................................................................. 36,-37

Fed. R. Bankr. P. 7056.......................................................................................1, 19

Fed. R.Civ. P. 56..............................................................................................19

**OTHER AUTHORITIES**

United States Constitution Article III ...........................................................32, 33, 34, 36

Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, Defendants MUFG Union Bank, N.A. ("MUFG" or the "Pre-Petition Agent") and UnionBanCal Equities, Inc. ("UBE" and, together with the Pre-Petition Agent, the "Defendants"), by their undersigned attorneys, hereby submit this brief (this "Brief") in support of their motion for summary judgment (the "Summary Judgment Motion").

As discussed herein, the Summary Judgment Motion should be granted and the Complaint dismissed for several reasons. First, the Plaintiff's claims are barred by *res judicata*. Second, the Plaintiff does not have authority and independent standing to pursue any claims regarding the extent, validity or amount of the Defendants' secured claims, or any other claims against the Defendants, and it did not (and now cannot) seek derivative standing to pursue estate causes of action because the operative deadlines have passed. Third, on its face, the Complaint fails to allege any facts that could support an allegation that the Defendants' secured claims are not valid, enforceable, and fully secured.

## PRELIMINARY STATEMENT[2]

Under the guise of asserting a "challenge" to the validity of the Defendants' liens, the Plaintiff seeks an end-run around the binding effect of the Court-approved allocation set forth in the Sale Order, which has been a final and non-appealable order for over three months. Through the Sale Order, the Court held that the allocation in the APA was not binding "***except as expressly set forth in section 2.7(i) of the APA***," which governs the allocation to the Defendants, and that the allocation of the Cash Purchase Price in section 2.7 of the APA shall "not bind the

---

[2]    Capitalized terms used in this Preliminary Statement and the Summary of Argument section have the meanings ascribed to such terms elsewhere in this Brief. Capitalized terms used but not otherwise defined in this Brief have the meanings ascribed to such terms in the Final DIP Order (as defined below), the Sale Order (as defined below), or the Complaint (as defined below), as applicable.

Court in determining the allocation of the **remaining proceeds** of the Sale Transaction."[3]

Accordingly, the Sale Order provides that the allocation set forth in 2.7(i) of the APA **is** binding

on all parties in interest, and therefore, the Plaintiff's claims to the contrary are an impermissible

collateral attack on this Court's order.

The Debtors validated the liens and claims of the Defendants. The Committee, upon

being granted standing as a fiduciary of the Debtors' estates, conducted an exhaustive factual and

legal investigation of the Defendants' liens and claims on the Pre-Petition Collateral and the

UBE Collateral and also validated them.[4] No other party in interest sought or was granted

authority or standing to investigate or challenge the validity and enforceability of the

Defendants' liens or the amount of the Defendants' claims, and in fact, the Plaintiff did not

conduct any investigation. Accordingly, pursuant to the Final DIP Order, the Defendants' liens

have been fully validated, and the amount of their claims against the Debtors' estates allowed in

full. Moreover, pursuant to the Final DIP Order and the Sale Order, the proceeds generated from

the sale of the Defendants' collateral were determined on a final basis to be in an amount that

was sufficient to satisfy Defendants' allowed and fully secured claims in their entirety, and the

Defendants were paid at closing.

If permitted to pursue this baseless litigation, the Plaintiff will cause a significant portion

of the remaining estate assets to be redirected into a protracted, costly and multi-stage valuation

fight[5]—notwithstanding the fact that the two primary estate fiduciaries in these Chapter 11

---

[3]     (Sale Order ¶ 62) (emphases added).

[4]     *See Stipulation with MUFG Union Bank, N.A., as Pre-Petition Agent, and UnionBanCal Equities, Inc., as Junior Administrative Agent, Determining Certain Committee Rights Pursuant to Final DIP Order* [D.I. 642] (the "UCC Stipulation").

[5]     Pursuant to various indemnification provisions in the prepetition loan documents, Paragraph 8 of the Final DIP Order, and Section 13.04 of the DIP Credit Agreement, as confirmed by Paragraph 9 of the Sale Order, the Debtors and their estates will bear in full the cost of the professional fees incurred in connection with this

2

Cases, the Debtors and the Committee, have already determined that such claims are without merit.  The Plaintiff's litigation tactic is even more egregious when considering that the Plaintiff is secured (if at all) primarily by the equity of WGFC and Weinstein Television LLC, has no cross-collateralization with the Defendants' collateral, and would only be paid from reallocated purchase price proceeds after general unsecured creditors—including alleged victims of Harvey Weinstein—are paid in full.  The Plaintiff therefore has no cognizable pecuniary interest in this litigation and, with virtually nothing to lose, is merely draining estate resources that could otherwise be used to satisfy unsecured and administrative-expense claims.[6]

The Court should view the Complaint for what it is, an improper collateral attack on final, non-appealable Court orders—essentially a pure leverage play aimed at forcing a cost of litigation payoff.[7]  There are no genuine issues of material fact, and indeed no additional facts are needed, to decide this issue.  Summary judgment should be granted in favor of the Defendants.

## NATURE AND STAGE OF PROCEEDING

1.      On March 19, 2018 (the "Petition Date"), The Weinstein Company Holdings LLC ("Holdings") and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions with the Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  On March 28, 2018, the Office of the United States Trustee for the District

---

action, which would include valuation and allocation litigation and, potentially, separate litigation regarding any diminution in the value of the Defendants' collateral.

[6]    Notably, Plaintiff has recourse for its claims through a guaranty from Harvey Weinstein and has sought stay relief to pursue those claims.  If relief from the stay is granted, the Plaintiff's recovery against Weinstein will be a "straightforward collection case," and "no estate resources will be expended."  *See Motion of AI International Holdings (BVI) Ltd. for Relief from Automatic Stay and Related Relief* ¶¶ 25, 29 [D.I. 1372].

[7]    The Plaintiff admits as much in the Complaint, noting that it "is not seeking a determination of how much of the Sale proceeds it is entitled to on account of its own claims, but reserves the right to seek appropriate relief at a later time if it cannot reach a consensual agreement with the Debtors and the Official Committee of Unsecured Creditors."  (Compl. ¶ 8, n.3).

of Delaware appointed an official committee of unsecured creditors (the "Committee").  No

trustee or examiner has been appointed.

2.    On June 2, 2018, AI International Holdings (BVI) Ltd. (the "Plaintiff")

commenced the above-captioned adversary proceeding (this "Adversary Proceeding") against the

Defendants by filing its Complaint [Adv. D.I. 1] (the "Complaint").

3.    On August 27, 2018, the Defendants filed their Answer to the Complaint [Adv.

D.I. 13].  A pre-trial conference in the Adversary Proceeding is currently scheduled to occur on

September 25, 2018.

## SUMMARY OF ARGUMENT

4.    Summary judgment is warranted in this matter for the following reasons:

**(a)  The doctrine of *res judicata* bars the Plaintiff from challenging the Court's holdings in the Sale Order.**

Pursuant to paragraph 62 of the Sale Order, the Court approved the allocation to the

Defendants which is binding on all parties in interest.  Specifically, paragraph 62 provides as

follows:

> Notwithstanding paragraph CC of this Order and ***except as expressly set forth in section 2.7(i) of the APA***, the Final DIP Order or this Order, the allocation of the Cash Purchase Price set forth in section 2.7 of the APA shall not be binding on any party in interest other than as between the Debtors and the Purchaser and shall not bind the Court in determining the allocation of the ***remaining*** proceeds of the Sale Transaction.[8]

The Plaintiff actively participated in every stage of the Sale Order, including by objecting to the

Sale on purchase price–allocation grounds, arguing its objection at the Sale Hearing, and

negotiating and commenting on paragraph 62 of the Sale Order, which confirmed the

---

[8]    (Sale Order ¶ 62) (emphasis added).

Defendants' allocation in section 2.7(i) of the APA.  The Plaintiff failed to appeal the Sale Order and failed to object to or appeal the APA Amendment Order.[9]

The Plaintiff is therefore barred by the doctrine of *res judicata* from challenging the allocation set forth in section 2.7(i) of the APA as expressly approved pursuant to the Sale Order, including paragraph 62 thereof.

**(b) The doctrine of *res judicata* also bars the Plaintiff from challenging the Court's holdings in the Final DIP Order.**

The Final DIP Order required any party-in-interest asserting a "Challenge," except for the Committee, to (i) investigate, (ii) be granted authority and standing by the Court, and (iii) file and prosecute such Challenge by the Investigation Termination Date.  Absent the filing of a valid "Challenge" on or before the Investigation Termination Date (which did not happen), it was "***immediately and irrevocably binding on*** . . . ***all parties-in-interest***" that (i) the Defendants' liens and security interests "***constitute valid, binding, enforceable, perfected and nonavoidable liens***," (ii) the Pre-Petition Obligations, DIP Obligations and UBE Obligations "***constitute allowed secured claims***" against the applicable Debtors' estates, and (iii) "***no claim of or cause of action held by the Debtors exists***" against the Defendants, "including without limitation, any right to assert any disgorgement . . ."[10]

---

[9]    Rather than raising any issues it had on various occasions when such concerns might have been pertinent (and permitted), the Plaintiff lay in wait while MUFG funded the bankruptcy cases with a fully drawn $25 million DIP Loan Facility (taking the full risk that the Sale would ultimately close).  This funding preserved, and provided an opportunity to maximize, the value of all estate assets, even those assets of the estate in which the Defendants did not have a prepetition interest—including the Plaintiff's purported collateral—despite the fact that Defendants had no prepetition security interest in such assets.

[10]    (Final DIP Order ¶¶ E(iii), F(iii), 16(a) (emphasis added)).  In addition, the Debtors were authorized to pay the Defendants in cash upon the closing of a sale.  (Final DIP Order ¶ 28).

It is indisputable that the Plaintiff did not seek and was not granted authority or standing to prosecute a Challenge. The Plaintiff is therefore barred by the doctrine of *res judicata* from challenging the validity and extent of the Defendants' liens and the payment to the Defendants.

**(c) The Plaintiff lacks standing to challenge the validity and extent of the Defendants' liens or claims or the allocation approved in the Sale Order.**

The Plaintiff's claims are estate causes of action, and the Plaintiff did not seek and does not have derivative standing to pursue such claims. Even assuming for the sake of argument that the claims in the Complaint could be asserted directly, the Plaintiff lacks standing in its own right to do so. The Plaintiff cannot demonstrate, and does not even allege, that it suffered an actual injury or that it is likely that a favorable decision would redress such injury. The Complaint should therefore be dismissed for lack of standing.

**(d) Counts III and IV are moot or otherwise barred because the claims are allowed under the Final DIP Order, there is no bar date established in these cases, and the Debtors amended their schedules to reflect that the Defendants' claims are liquidated and non-contingent.[11]**

**(e) Because the Plaintiff cannot challenge the Debtors' payment to the Defendants or the allocation, Counts V and VI, which seek disgorgement, are also moot or otherwise barred.**

In addition to Counts V and VI being moot or otherwise barred, there are no allegations in the Complaint supporting an argument that the payment the Defendants received upon the closing of the Sale exceeded the value of the Defendants' collateral. Instead, the Plaintiff simply alleges—without any factual support and contrary to the Sale Order upon which it commented— that it is "entitled" to a determination of the value of the collateral. The Complaint also does not

---

[11]    *See Amended Schedule D* for The Weinstein Company LLC [D.I. 1463] and *Amended Schedule D* for TWC Domestic LLC [D.I. 1464], both of which confirm that the Defendants' secured claims are ***not*** contingent, unliquidated or disputed.

allege any facts showing that Plaintiff would be entitled to a distribution on account of the sale proceeds or how or why any sale proceeds would be re-allocated to Plaintiff.

**STATEMENT OF FACTS**

5.      In support of their Summary Judgment Motion, the Defendants set forth below the following statement of the undisputed material facts as to which there is no genuine issue to be tried:[12]

## I.    THE DEFENDANTS' LIENS ARE NOT SUBJECT TO A BONA FIDE DISPUTE.

6.      MUFG, formerly known as Union Bank, N.A., is the administrative agent under (i) the Pre-Petition Credit Agreement with TWC Domestic, LLC ("<u>TWC Domestic</u>") and (ii) the DIP Credit Agreement.[13]  TWC Domestic's obligations under the Pre-Petition Credit Agreement are guaranteed by The Weinstein Company, LLC ("<u>TWC</u>") and secured by the Pre-Petition Collateral, which consists of a first-priority lien on substantially all of TWC Domestic's assets and a senior pledge of TWC's equity in TWC Domestic.

7.      UBE is the administrative agent under a Credit and Security Agreement dated October 9, 2015 (as amended), among UBE, TWC Domestic and the lenders referred to therein ("<u>UBE Credit Agreement</u>").  TWC Domestic's obligations are secured by the UBE Collateral, which consists of a junior lien on substantially all of TWC Domestic's assets.

8.      The Complaint does not even allege that the Defendants' liens are invalid. Indeed, the Plaintiff has not conducted any investigation pertaining to the Defendants' liens, and it does not identify or allege any basis upon which the Court could find such liens are invalid.

---

[12]    The *Declaration of Michael S. Neiburg in Support of the Defendants' Motion for Summary Judgment* (the "<u>Neiburg Declaration</u>") is being filed concurrently herewith containing certain of the documents identified in this Brief.  Except with respect to certain pertinent filings made on the docket, cited materials from the docket are not included in the Neiburg Declaration.

[13]    The DIP Credit Agreement is Exhibit A to the Final DIP Order, which is attached as <u>Exhibit 1</u> to the Neiburg Declaration.

To the contrary, the Complaint states explicitly that (i) TWC Domestic's obligations under the Pre-Petition Credit Agreement are "secured by a first-priority lien on substantially all of TWC Domestic's assets and a senior pledge of TWC's equity in TWC Domestic," (ii) "[t]he DIP Loan is secured by all present and after-acquired property of the Debtors," and (iii) TWC Domestic's obligations under the UBE Credit Agreement "are secured by a junior lien on substantially all of TWC Domestic's assets."[14]

9.      The Committee fully investigated the Defendants' liens and ultimately stipulated to their validity.  (*See* UCC Stip. ¶ 1);[15] Transcript of May 8, 2018 Hearing at 48:3-4 ("Sale Hr'g Tr.")[16] ("The committee has done its work with respect to the challenge.").  In particular, following its investigation, the Committee agreed to waive "all rights to assert," and agreed and acknowledged that it was "forever barred from asserting for all purposes, a Challenge or objection to the extent, amount, validity, perfection and priority of the liens in the Pre-Petition Collateral, the Pre-Petition Obligations, the liens in the UBE Collateral and the UBE Obligations, as set forth in paragraph 16 of the Final DIP Order."  (UCC Stip. ¶ 1).

10.     None of the Plaintiff's purported collateral crosses with the Pre-Petition Collateral or the UBE Collateral.[17]  Because the Plaintiff is secured in the equity of Weinstein Global Film Corp. ("WGFC") and Weinstein Television LLC, any distributions in this case will first be

---

[14]    (Compl. ¶¶ 18, 20, 21).

[15]    The UCC Stip is attached as Exhibit 2 to the Neiburg Declaration.

[16]    The Sale Hr'g Tr. is attached as Exhibit 3 to the Neiburg Declaration.

[17]    The Plaintiff's collateral consists of "i) all of TWC's rights, title, and interest in all issued and outstanding capital stock of WGFC; ii) all of Holdings' right, title, and interest in all issued and outstanding membership interests in [Weinstein Television, LLC]; and iii) WGFC's right, title, and interest in the distribution and exploitation rights to the 'Foreign Film Rights Collateral' as defined in the AI International PSA."  (Compl. ¶ 15).  The Plaintiff's security interests in WGFC's right, title, and interest in the distribution and exploitation rights to the Foreign Film Rights Collateral are the subject of a bona fide dispute, as its "pledge of international distribution rights is arguably a fraudulent conveyance . . . ."  *See Preliminary Objection to Credit Bid of AI International Holdings (BVI) Ltd.* [D.I. 489].

applied to satisfy the claims of general unsecured creditors of WGFC and Weinstein Television LLC before any distribution is made to the Plaintiff.

## II.     THE FINAL DIP ORDER EXPRESSLY PROVIDES THE DEFENDANTS WITH A BARGAINED-FOR SET OF RIGHTS.

### A.     MUFG Negotiated the DIP Credit Agreement and Agreed to Provide DIP Financing In Reliance Upon the Value of The Defendants' Collateral, Which Value Was Independently Confirmed by the Debtors, Lantern, and the Committee.

11.     The payment of the Pre-Petition Obligations and the related value allocation has been a pivotal issue at the forefront of the Chapter 11 Cases.  Prior to the commencement of the Chapter 11 Cases, the Debtors confirmed that the value of the Defendants' collateral exceeded their prepetition secured debt.  This determination was critical to MUFG's decision to provide DIP financing to support not only the TWC Domestic Collateral but also the assets of the other Debtors (inclusive of the purported collateral of the Plaintiff).  In order to potentially generate additional recoveries for the Debtors and their estates through a comprehensive sale process, the Debtors requested that the Defendants provide DIP financing and, essentially, take the full risk that a sale of substantially all of the Debtors' assets would be consummated.  Based on the Debtors' agreement as to the value of TWC Domestic Collateral, memorialized in section 2.7(i) of the APA and confirmed by the Debtors' advisors, by Lantern Entertainment LLC ("Lantern"), and by the Committee following its investigation, MUFG agreed to provide DIP financing and fund a robust sale process.

12.     The value and the corresponding allocation of the Defendants' collateral in TWC Domestic was thus a "critical factor in sizing the DIP loan, especially given that, without reliable revenue to pay down the DIP loan during the course of the case . . . the DIP lenders [were] taking the full risk of being paid from the sale proceeds, which, by definition, assume[d] the risk that there [would] be, in fact, a successful 363 sale of the company."  *See* Transcript of April 19,

2018 Hearing at 13:11-18, *In re The Weinstein Company Holdings, et al.*, Case No. 18-10601 (MFW) (Apr. 19, 2018) ("Second Day Hr'g Tr.").[18] MUFG provided funding to the Debtors "on a going concern basis . . . in order to maximize the value for creditors outside of TWC Domestic, and thereby enhance the prospect that the company would be able to continue to employ at least part, if not all of the employees," notwithstanding the fact that MUFG "did not stand to gain anything from the value created outside the domestic film borrowing base library." (Second Day Hr'g Tr. at 13:19-14:2).

13.     With these issues squarely in the forefront, the DIP Credit Agreement confirmed the parties' agreement that the Debtors were to file a sale motion with a purchase price "allocated in a manner that provides value with respect to the Prepetition Collateral *equal to or in excess of the aggregate amount of the Obligations and the Prepetition Obligations) . . . .*" (DIP Credit Agreement § 4.01(h)) (emphasis added). The DIP Credit Agreement further required the allocation in the asset purchase agreement to be "in form and substance reasonably acceptable *(including, without limitation, with respect to the allocation of the purchase price)*" to MUFG. (*Id.*) (emphasis added). The Debtors also agreed to consummate a sale by July 17, 2018 that would result in the payment of the Pre-Petition Obligations *in full*.[19]

14.     Accordingly, on March 19, 2018, the Debtors filed a motion [D.I. 11] (the "DIP Motion") for interim and final orders approving debtor-in-possession financing in accordance with the terms of the DIP Credit Agreement.

15.     On March 20, 2018, the Court entered an order approving the DIP Motion on an interim basis [D.I. 76] (the "Interim DIP Order"), and on April 19, 2018, the Court entered an

---

[18]    The Second Day Hr'g Tr. is attached as Exhibit 4 to the Neiburg Declaration.

[19]    (DIP Credit Agreement § 6.18).

order approving the DIP Motion on a final basis [D.I. 267] (the "Final DIP Order").[20]  The

Plaintiff did not object to the entry of the Interim DIP Order or the Final DIP Order, and did not

appeal entry of the Final DIP Order.  *Cf.* Compl. ¶ 20 ("The Court approved the DIP Loan

Agreement and entered a *final* order on April 19, 2018." (emphasis added)).  The deadline for

appealing the Final DIP Order expired on May 3, 2018.

> **B.    The Plaintiff Failed to Comply with the Clear and Unambiguous Process for
> Challenging the Defendants' Liens Under the Final DIP Order.**

16.    The Final DIP Order set forth a straightforward and typical process for

challenging the Defendants' liens.  Under paragraph 16 of the Final DIP Order, parties had

seventy-five (75) days from the Petition Date, until June 2, 2018 (the "Investigation Termination

Date"), "to investigate the validity, perfection, and enforceability" of the Defendants' liens "and

to assert any other claims or causes of action" against the Defendants.  (Final DIP Order ¶ 16).

The Final DIP Order expressly contemplated that parties had only until the Investigation

Termination Date to file any such claims or objections or "initiate an appropriate action *on*

*behalf of the Debtors' estates* . . . ."  (*Id.*) (emphasis added).  The Final DIP Order was explicit,

however, that "*nothing* contained in the DIP Loan Documents or [the Final DIP Order] *shall be*

*deemed to confer standing on any party-in-interest*" to commence such an action.  (*Id.*)

(emphasis added).  Rather, a party's ability "to file and prosecute an objection or claim related

thereto (each, a 'Challenge')" was expressly "*subject . . . to being granted authority and*

*standing by th[e] Court* . . . ."  (*Id.*) (emphasis added).

---

[20]    *See* Final DIP Order, Ex. 1 to the Neiburg Declaration.  The Final DIP Order provided that, in the event of any
diminution of value in the Pre-Petition Agent's collateral, the Pre-Petition Agent was entitled to adequate
protection including, among other things, (i) the payment of its fees and expenses, (ii) adequate protection liens
that are junior only to the DIP Liens, the Pre-Petition Third-Party Liens, and any Permitted Third Party DIP
Liens and subject to the Carve-Out, and (iii) Superpriority Adequate Protection Claims, junior only to the DIP
Superpriority Claims, the claims secured by the Pre-Petition Thirty-Party Liens, any Permitted Third-Party DIP
Indebtedness and the Carve-Out.  (Final DIP Order ¶ 12).

17.    In its Complaint, the Plaintiff's quotation of paragraph 16 conspicuously omits the above language indicating that claims challenging the Defendants' liens are brought "on behalf of the Debtors' estates." (*See* Compl. ¶ 26).  Whether or not the Plaintiff seeks to bring its action on behalf of the Debtors' estates, the Plaintiff's Complaint also omits the language indicating that a party cannot bring a "Challenge" under the Final DIP Order without "being granted authority and standing" to do so.  (*Id.*).  Finally, the Plaintiff's Complaint also omits language in the Final DIP Order indicating that *only* "the Committee shall be deemed, pursuant to this order, to have standing to bring a Challenge."  (Final DIP Order ¶ 16; *see also* Compl. ¶ 26).[21]

18.    The Plaintiff did not bring a valid "Challenge" on or before the Investigation Termination Date, and thus, it was "immediately and irrevocably" determined that:

- The Defendants' liens and security interests "***constituted valid, binding, enforceable, perfected and nonavoidable liens***" in the collateral.

- The Pre-Petition Obligations and DIP Obligations "***constituted allowed secured claims against the applicable Debtors' estates*** . . . .

- "***[N]o claim of or cause of action held by the Debtors existed***" against the Defendants.

(Final DIP Order ¶¶ E(iii), F(iii), 16(a)) (emphases added).

---

[21]    Tellingly, the Plaintiff repeatedly states in the Complaint that it is bringing a *"challenge"*—in quotation marks, with a lower-case letter "c"—rather than a *Challenge* under the Final DIP Order.  (*See* Compl. ¶ 8 ("This action constitutes a timely 'challenge' under the order approving debtor-in-possession financing in these cases . . . ."));  (*id.* at n.3 ("AI International is filing this complaint at this time to ensure its 'challenge' is timely . . . .")).  The Complaint even goes so far as to change "Challenge" to "[c]hallenge" when quoting paragraph 28 of the Final DIP Order.  (*See* Compl. ¶ 27).

**III.  THE PLAINTIFF PARTICIPATED FULLY IN THE SALE PROCESS AND DID NOT CONTEST, OR AT THE VERY LEAST ACQUIESCED TO, THE DEFENDANTS' PURCHASE PRICE ALLOCATION, WHICH WAS APPROVED BY FINAL ORDER OF THE COURT.**

**A.  The Sale Order Allocated Sale Proceeds to the Defendants as Set Forth in Section 2.7(i) of the APA.**

19.    On March 20, 2018, the Debtors filed a motion [D.I. 8] (the "Bid Procedures Motion") seeking entry of an order approving bidding procedures for the sale (the "Sale") of substantially all of the Debtors' assets and approving an asset purchase agreement (the "APA")[22] with Lantern.

20.    Pursuant to section 2.7 of the APA, which was attached as Exhibit B to the Bid Procedures Motion, the Debtors and Lantern stipulated that the value allocable to the Defendants' collateral was greater than the amounts the Defendants were owed:

> Section 2.7 Aggregate Purchase Price. [. . .] Each of Buyer and each Seller Party hereby acknowledges and agrees that the Cash Purchase Price shall be allocated such that **(i) the value of the Purchased Assets that comprise the TWC Domestic Collateral is greater than the sum of (v) the TWC Domestic Debt[23] (in the amount, as of the date hereof, of approximately $175 million (inclusive of the Pre-Petition Agent's financial advisor's deferred fee)), plus (w) the principal amount outstanding under the DIP Financing Agreement, in the form filed on the Petition Date for approval by the Bankruptcy Court, provided that such principal amount, for purposes of this Section 2.7, shall not be in excess of $26 million, plus (x) all Guild Residuals secured by the TWC Domestic Collateral and accrued prior to the Petition Date (in the amount, as of the date hereof, of approximately $8 million), plus (y) the amount of all interest accrued and unpaid after the Petition Date through the Closing Date on the amounts described in the preceding clauses (i)(v) through (i)(x), minus (z) any principal payments on the amounts described in the preceding clauses (i)(v) through (i)(x) after the Petition Date and through the Closing Date; and**

---

[22]    The APA is Exhibit 1 to the Sale Order, which is attached as Exhibit 5 to the Neiburg Declaration.

[23]    The term "TWC Domestic Debt" is defined in the APA as "all indebtedness outstanding" under the Prepetition Credit Agreement and the UBE Credit Agreement. *See* Ex A-14. to APA.

(ii) the value of the Purchased Assets that comprise the BAML Collateral is greater than the sum of the (w) BAML Debt (in the amount, as of the date hereof, of approximately $18.5 million), plus (x) all Guild Residuals secured by the BAML Collateral and accrued prior to the Petition Date, if any, plus (y) the amount of all interest accrued and unpaid after the Petition Date through the Closing Date on the amounts described in the preceding clauses (ii)(w) and (ii)(x), minus (z) any principal payment(s) on the amounts described in the preceding clauses (ii)(w) and (ii)(x) after the Petition Date through the Closing Date; and (iii) such allocated amounts of the Cash Purchase Price will be so allocated to such Purchased Assets. . . .

(APA § 2.7 (emphasis added); *see also* Sale Order ¶ CC).

21.    On April 6, 2018, the Court entered an order [D.I. 190] (the "Bid Procedures Order") approving the Bid Procedures Motion.

22.    In their negotiations with the Committee over the proposed Bid Procedures Order, the Defendants agreed to a Challenge deadline for the Committee and granted it standing with respect to any Challenge.  (Bid Procedures Order ¶ 22).

23.    On April 30, 2018, the Plaintiff filed a limited objection to the sale of the Debtors' Assets [D.I. 582] (the "Sale Objection") and argued that the proceeds of the Sale, "other than those required to be distributed to the DIP Lenders under the Final DIP Order," should be segregated and held in escrow as cash collateral of the Plaintiff pending further order of the Court.  (Sale Obj. ¶ 5).  Far from challenging the Defendants' liens or questioning the allocation set forth in Section 2.7(i) of the APA, the Plaintiff's Sale Objection only questioned allocation generally.  The Sale Objection was ultimately resolved through the agreed language set forth in paragraph 62 of the Sale Order, which, as discussed below, confirmed that sufficient value was allocated to the Defendants' collateral to satisfy the Pre-Petition Obligations and UBE Obligations in full, as contemplated by the Final DIP Order.

24.    At the hearing held on May 8, 2018 to consider the sale of the Debtors' assets (the

"Sale Hearing"), Bank of America argued that it should be paid off from Sale proceeds in the

same manner that the Defendants were being paid off.  (*See* Sale Hr'g Tr. at 41:17-43:15)

(emphasis added).  The Debtors disputed Bank of America's position, arguing that the

Defendants were differently situated because they had received stipulations in connection with

providing DIP financing and had already had their liens investigated by the Committee:

> Our main concern on this is unlike Union Bank – as you know
> Union Bank provided DIP financing and in exchange for that
> Union Bank got the typical debtor stipulations and there was also a
> challenge process that was agreed with the committee and the
> committee went through the process of confirming their liens.

(Sale Hr'g Tr. at 46:1-6).

25.    The Committee agreed with the Debtors, explaining that it "had done its work

with respect to the challenge" of the Defendants' liens and, further, that the Defendants' right to

payment from sale proceeds is part of "a whole negotiated set of rights" that arose from the Final

DIP Order and did not "have anything to do with the sale motion."  (Sale Hr'g Tr. at 48:3-15).

26.    The Plaintiff also agreed and joined the attack on Bank of America's position,

arguing that the APA did not entitle Bank of America to automatic payment of sale proceeds,

which was "unlike the treatment of the prepetition secured lenders through their agreement to

provide the DIP . . . ."  (Sale Hr'g Tr. at 53:11-21).

27.    In case the understanding of the parties regarding the treatment of the Defendants'

claims under the Final DIP Order and the Sale Order was not already clear, counsel to the Pre-

Petition Agent further clarified as follows:

> I just wanted to reiterate [the Committee's counsel's] comments
> that I don't understand Bank of America to be objecting to the
> payment of the DIP loan and the prepetition loan pursuant to the
> sale order.  I hear him wanting the same deal.  And I just want to

> make it clear that we are operating under very different circumstances for the reasons stated pursuant to the DIP loan paragraph 28 [which] in particular makes it clear that upon the sale order and closing of the sale, pursuant to the APA, that we are to be paid the proceeds for the DIP loan and the prepetition loan, and that the UCC did fully validate our liens pursuant to a lien challenge period.

(Sale Hr'g Tr. at 56:2-12).

28.     Acknowledging that "clearly Union Bank has certain specific rights with respect to payment, and the DIP order and the sale order," the Debtors proposed including language in the Sale Order that would state that the allocation in Section 2.7 would not bind parties in interest "*other than as set forth in the DIP financing order and this sale order*."  (Sale Hr'g Tr. at 59:4-9) (emphasis added).  The Court confirmed this approach without any objection from the Plaintiff.  (Sale Hr'g Tr. at 59:10).

29.     Accordingly, at the conclusion of the Sale Hearing, the Debtors, the Committee, the Plaintiff, and the Defendants, among others, negotiated a revised proposed form of order. After considering comments made by the Committee and Plaintiff, the Defendants clarified that subsection 2.7(i), which recited that the value allocable to the Defendants' collateral was greater than the amounts the Defendants were owed, would be binding on all parties, consistent with the DIP Credit Agreement and the parties' comments at the Sale Hearing:

> Notwithstanding paragraph CC of this Order and except as expressly set forth in **section 2.7(i) of the APA**, the Final DIP Order or this Order, the allocation of the Cash Purchase Price set forth in section 2.7 of the APA shall not be binding on any party in interest other than as between the Debtors and the Purchaser and shall not bind the Court in determining the allocation of the **remaining** proceeds of the Sale Transaction.

(Sale Order ¶ 62) (new language emphasized).[24]  Therefore, the Defendants' allocation was specifically carved out from the general language providing that the allocation set forth in the APA would not be binding on any party in interest.

30.     The Debtors submitted the revised proposed order under certification of counsel, and on May 9, 2018, the Court entered the proposed order [D.I. 846] (the "<u>Sale Order</u>"),[25] which (i) specifically carved out the Defendants' allocation from the general language providing that the allocation set forth in the APA would not be binding on any party in interest and (ii) approved the Sale to Lantern.  The Sale Order approved the APA in its entirety.  (Sale Order ¶ 4) ("The APA . . . and all the terms and conditions thereof, are approved in all respects.  The failure to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA is authorized and approved in its entirety.").  The Sale Order also expressly held that it, the APA, and the Defendants' allocation contained therein were "binding in all respects" on all parties in interest. (Sale Order ¶ 50).  The deadline for appealing the Sale Order expired on May 23, 2018.

31.     In its Complaint, the Plaintiff's quotation of paragraph 62 conspicuously omits the language most pertinent to the instant dispute, which states that the allocations in the APA are not binding "***except as expressly set forth in section 2.7(i) of the APA*** . . . ."  (*See* Compl. ¶ 31).

**B.     The Plaintiff Did Not Contest the APA Amendment Order.**

32.     On June 27, 2018, in response to certain objections concerning payment of cure amounts required to assume and assign certain of the Debtors' contracts to Lantern at the Sale closing, the Debtors entered into an amended APA stating an amended purchase price (the

---

[24]   Email correspondence concerning the revised proposed sale order is attached as <u>Exhibit 6</u> to the Neiburg Declaration.

[25]   *See* Sale Order, Ex. 5 to the Neiburg Declaration.

"Amended APA") and sought Court approval of a settlement with Lantern that enabled the

Debtors to close the Sale with certainty [D.I. 1115] (the "APA Amendment Motion").

33.     On July 11, 2018, following a hearing, the Court entered an order [D.I. 1220] (the

"APA Amendment Order") approving the Amended APA.  The APA Amendment Order

provides that "[e]xcept as may be set forth in this Order or the Second Amendment," there were

no amendments to any provisions of the APA or the Sale Order.  (APA Amendment Order ¶ 3).

The Amended APA does not modify the allocation in Section 2.7(i).  Once again, the Plaintiff

did not object to entry of the Amended APA Order.  The deadline for appealing the Amended

APA Order expired on July 25, 2018.

34.     Both the Sale Order and the Amended APA Order are final, non-appealable

orders.  (Sale Order ¶¶ C, 54; Amended APA Order ¶¶ 5–6); *see also* Transcript of July 11, 2018

Hearing at 32:20-33:6 (hereinafter "APA Amendment Hr'g Tr.")[26] ("No one has appealed to a

final order approving [the original sale agreement]" and "that train [has] left the station") (The

Hon. Christopher S. Sontchi); APA Amendment Hr'g Tr. at 51:11-22 ("I am going to overrule

the objections.  The vast majority of which I believe really deal with issues that were already

dealt with in the previous order and are not modified in an adverse way in the current order. . . .

That order was a final order.  No appeals were taken.  It's been final for almost two months. . . .

So, I think that many of these arguments that were made in the objections were -- are by law of

the case or a waiver.") (The Hon. Christopher S. Sontchi).

35.     The Sale closed on July 13, 2018 [D.I. 1247] (the "Closing Date").  On the

Closing Date, as contemplated and authorized by the Sale Order and the Final DIP Order, the

---

[26]    The APA Amendment Hr'g Tr. is attached as Exhibit 7 to the Neiburg Declaration.

Defendants received payments from TWC Domestic on account of the Prepetition Obligations

and the UBE obligations, as well as replacement liens in the Sale proceeds.

## ARGUMENT

36.    Summary judgment should be granted where there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law.[27]  *In re Mullins*, No.

16-11032 (BLS), 2017 WL 3705071, at *2 (Bankr. D. Del. Aug. 24, 2017) (citing to *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)).  No materials facts are in genuine dispute in this

action.[28]

## I.    THE SALE ORDER AND THE FINAL DIP ORDER ARE FINAL ORDERS THAT ARE NOT SUBJECT TO COLLATERAL ATTACK.

37.    Through the Complaint, the Plaintiff collaterally raises matters it could have

raised—or did raise and then conceded—in response to the Sale Motion, the DIP Motion, the

APA Amendment Motion, at any of the hearings related thereto, or in an appeal to the orders

---

[27]    Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the Federal Rules of Civil Procedure, which provides, in part, that "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b).  The rule "authorizes a defending party to move 'at any time' for a summary judgment in his favor," and "[s]uch a motion may [even] be made before pleading to the complaint." *See, e.g.*, *Hubicki v. ACF Indus., Inc.*, 484 F.2d 519, 522 (3d Cir. 1973) (affirming summary judgment where the only facts before the court were those contained in the plaintiff's complaint and opposing affidavit).

[28]    The "mere existence of *some* alleged factual dispute" is not sufficient to defeat a motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *In re Newpage Corp.*, 517 B.R. 508, 510 (Bankr. D. Del. 2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)) (emphasis in original).  A fact is "material" if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).  A dispute about a material fact is "genuine," and thus warrants trial, "when reasonable minds could disagree on the result." *Id.* (quotation and citation omitted).  "[T]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *In re TK Holdings Inc.*, No. 17-11375 (BLS), 2018 WL 903980, at *4 (Bankr. D. Del. Feb. 14, 2018) (quoting *Anderson,* 477 U.S. at 252).  "The non-moving party must 'do more than simply show that there is some metaphysical doubts as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

before they became final.[29]  Now that these orders are final and non-appealable, the Plaintiff's

collateral attack on the Court's prior orders is precluded by the doctrine of *res judicata*.[30]

38.     "Under the doctrine of res judicata, a final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been raised

in that action."  *In re 11 E. 36th LLC*, No. 13-11506 (JLG), 2016 WL 152924, at *7 (Bankr.

S.D.N.Y. Jan. 12, 2016) (citation and internal quotation marks omitted).  *Res judicata* "gives

dispositive effect to a prior judgment if a particular issue, although not litigated, *could have been

raised* in the earlier proceeding."  *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d

Cir.1999).  In such circumstances, a court "*must dismiss* . . . any claim that was previously

raised, or which could have been raised previously."  *Roberts v. White*, 698 F. Supp. 2d 457, 460

(D. Del. 2010) (emphasis added).

39.     The Sale Order and the Final DIP Order are final, non-appealable orders that

address the precise issues and claims raised in the Complaint.[31]  As discussed below, the Court

---

[29]  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("A strong interest to achieve finality pervades Chapter 11 arrangements." (internal citation omitted)); *see also In re Pardee*, 218 B.R. 916, 923 (B.A.P. 9th Cir. 1998) ("The concept of the preclusive effect of final orders is a basic principle of American jurisprudence." (internal citation omitted)).

[30]  The APA is governed by Delaware law and the DIP Credit Agreement is governed by New York law.  APA § 13.6; DIP Credit Agreement § 13.14(a).  To the extent there is an argument that state law, rather than federal common law, applies to the *res judicata* analysis set forth herein, the analysis would not change.  *Compare Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 190 (2d Cir. 1985) ("Under New York law, "[r]es judicata "precludes later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a competent court of jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action."), *with Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013) (holding that under federal common law, "[a] party seeking to invoke res judicata must establish three elements: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." (citations omitted)), *and In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 52 (Bankr. D. Del. 2001) (Under Delaware law, *res judicata* applies upon proof of "(1) a final judgment on the merits of a prior action, (2) involving the same parties or their privies, and (3) a subsequent suit based on the same cause of action.").

[31]  *Cf.* Compl. ¶ 20 ("The Court approved the DIP Loan Agreement and entered a *final order* on April 19, 2018." (emphasis added)); *see also* APA Amendment Hr'g Tr. at 51:16-19 ("[The sale] order was a final order.  No appeals were taken.  It's been final for almost two months.") (The Hon. Christopher S. Sontchi).

authorized the allocation to the Defendants, which was expressly binding on *all* parties, under the Sale Order, and the Final DIP Order authorized the payment of such allocation to the Defendants on the Closing Date.  The Plaintiff did not appeal either the Sale Order or the Final DIP Order, and it did not commence a Challenge.  Its claims are therefore precluded as a matter of law.

>    A.    **The Express Provisions of the Sale Order Bar the Plaintiff From Challenging the Allocation in the APA.**

40.    The Sale Order is explicit that the allocation set forth in the APA (i) is not binding on the parties "***except as expressly set forth in section 2.7(i) of the APA, the Final DIP Order or this Order***" and (ii) "shall not bind the Court in determining the allocation of the ***remaining proceeds*** of the Sale Transaction."  (Sale Order ¶ 62) (emphasis added).  Section 2.7(i) of the APA addressed the allocation to the Defendants and was expressly excepted from the allocation carve-out of the "remaining proceeds."  This section allocated the value of the purchase price in an amount sufficient to satisfy the DIP Obligations, the Pre-Petition Obligations, the UBE Obligations, and established a pre-negotiated reserve for the Guild claims.  In contrast, section 2.7(ii) of the APA, which addresses the BAML Collateral, was specifically reserved along with other allocation issues for later agreement among the parties or adjudication by the Court with respect to the "remaining proceeds."  (*See* APA § 2.7(ii)).

41.    Pursuant to the Sale Order, on the Closing Date, the Debtors were required to pay, or cause Lantern to pay, "in full in cash" any and all outstanding DIP Obligations and Pre-Petition Obligations and all other amounts owed in accordance with the payoff letters provided by the DIP Agent and the Pre-Petition Agent to the Debtors.  (Sale Order ¶ 8).

42.    As noted above, when the issues of payment to MUFG and the allocation to the Defendants set forth in Section 2.7 of the APA were expressly addressed by numerous parties at the Sale Hearing, including the Plaintiff, not only did Plaintiff fail to object to such treatment, its

counsel stated *on the record* that the language of the APA specifically required such payment to MUFG through its agreement to provide the DIP financing."[32]

43.    At the conclusion of the Sale Hearing, the Debtors, the Committee, the Plaintiff, and the Defendants negotiated a revised proposed form of order, pursuant to which the Defendants' allocation was specifically carved out from the general language providing that the allocation set forth in the APA would not be binding on any party in interest.  The Plaintiff did not appeal the Sale Order.

44.    The Plaintiff had yet another opportunity, and again failed, to dispute the allocation in connection with the APA Amendment Motion, which sought to amend certain terms of the APA but did not modify the allocation set forth in Section 2.7(i).  With respect to Section 2.7, the APA Amendment Order merely replaced the Purchase Price amount.  The APA Amendment Order did not modify paragraphs 8 or 62 of the Sale Order, discussed above, and the Plaintiff should not be permitted to use this litigation to take a second (or third, or fourth…) bite at the apple and object to the treatment of the Defendants under the Sale Order.

45.    Case law is clear that *res judicata* bars any claims that a party could, or should, have raised before entry of a sale order.  *See, e.g.*, *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 279–80 (4th Cir. 2016); *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 580 (6th Cir. 2008); *In re The IT Grp., Inc.*, 322 B.R. 729, 736 (Bankr. D. Del. 2005) (holding that *res judicata* and law-of-the-case doctrine barred argument that contracts had been assumed when sale order did not provide for assumption).

---

[32]    (Sale Hr'g Tr. at 53:11-21) (arguing that the APA did not entitle Bank of America to automatic payment of sale proceeds, which was "unlike the treatment of the prepetition secured lenders through their agreement to provide the DIP . . .").

46.     In *Winget*, the bankruptcy court ordered the sale of substantially all of the debtor's

assets, and the proceeds of the sale were applied to the debtor's outstanding balance owed its

lenders.  *Winget*, 537 F.3d 5 at 571.  Subsequently, one of the guarantors of the lenders' loan to

the debtor filed suit against the lenders and alleged a series of claims all essentially asserting that

the lenders acted to devalue the debtor's assets prior to the filing of the petition.  *Id.* at 579–

80.  The Sixth Circuit squarely held that *res judicata* barred the claim:  "Winget's claims

attacked the heart of the Sale Order: the value of the assets.  Those claims should only have been

brought before the bankruptcy court issued the Sale Order."  *Id.* at 580.

47.     The *Providence Hall* case is also instructive here.  In that case, the Fourth Circuit

held that *res judicata* barred a debtor from challenging the propriety of certain loan transactions

when the bankruptcy court had already entered sale orders directing sale proceeds to be used to

pay the lender in connection with those transactions.  *See Providence Hall*, 816 F.3d at 275.  In

*Providence Hall*, the debtor, Providence Hall Associates ("PHA"), entered into three transactions

with Wells Fargo:  (1) a $2.5 million loan, (2) a $500,000 line of credit, and (3) an interest-rate

swap agreement (collectively, the "Loan Transactions").  *Id.*  PHA could not pay off the line of

credit at maturity and was forced to file chapter 11.  *See id.*  PHA filed an adversary complaint

against Wells Fargo, asserting fraud and other counts calling into question the propriety of

PHA's debt to Wells Fargo.  *See id.*

48.     After PHA failed to file its monthly financial reports and, allegedly, misused cash

collateral, the bankruptcy court appointed a chapter 11 trustee.  *Id.*  The trustee brought a claim

against PHA's principal and consented to dismissal of the complaint against Wells Fargo.  *See*

*id.* at 276.  The chapter 11 trustee also filed two motions to sell estate assets to pay down PHA's

obligations on account of the Loan Transactions.  *Id.* at 275–76.  The bankruptcy court granted

the motions, Wells Fargo was paid from sale proceeds, and the chapter 11 case was dismissed. *Id.* at 276. More than a year later, however, PHA brought a lender-liability suit against Wells Fargo, largely repeating its claims from the adversary proceeding. *See id.* The district court granted Wells Fargo's motion to dismiss on the basis of *res judicata*, holding that the bankruptcy court's sale orders precluded PHA's claims. *Id.* PHA appealed, and the Fourth Circuit affirmed. *Id.* at 275. While PHA could have (and in fact did) challenge the Loan Transactions in the bankruptcy proceedings, the chapter 11 trustee had "effectively conceded the validity of PHA's obligations to Wells Fargo, and the proceeds of the sales satisfied those obligations." *Id.* at 279. Moreover, "[i]n the final sale order," the bankruptcy court had "explicitly stated that sale proceeds should be paid to Wells Fargo 'up to the amount of the WFB Obligations,'" with "WFB Obligations" defined as PHA's debts arising from the Loan Transactions. *Id.* at 276. In sum, PHA could not challenge the propriety of the Loan Transactions because the bankruptcy court's final sale orders had already established the propriety of those transactions.

49.     Like in *Winget* and *Providence Hall*, the Sale Order and the APA Amendment Order are final orders. (Sale Order ¶ 54; APA Amendment Order ¶ 5). Accordingly, because the Plaintiff, who raised the allocation issue in its Sale Objection, prosecuted that objection, actively participated in the negotiation of the Sale Order (including the allocation carve-out in paragraph 62), and failed to appeal the entry of such orders, the Plaintiff is now barred from challenging the orders by *res judicata*. For these reasons, summary judgment should be granted to the Defendants on Counts I-II and V-VI.

**B.    The Debtors' Stipulations Made for the Benefit of the Defendants Became _Immediately and Irrevocably Binding_ Once the Investigation Termination Date Lapsed, and the Plaintiff is Now Barred From Challenging Such Stipulations.**

50.    Even assuming *arguendo* the Court finds that Plaintiff's claims are not barred by the Sale Order, the Plaintiff's claims are nevertheless barred because (i) it did not investigate any of the Defendants' liens or claims, and (ii) it did not seek or receive authority or standing to assert such claims, as required pursuant to the Final DIP Order and binding case law.

**(i)    The Plaintiff Failed to Bring a Challenge in Accordance with the Terms of the Final DIP Order.**

51.    Through the express terms of the Final DIP Order, the Court approved a process by which parties-in-interest could challenge the validity and extent of the Defendants' liens and claims or seek disgorgement of the payment to the Defendants.  (Final DIP Order ¶¶ 16, 28). This process required any party-in-interest to complete all of the following actions by the Investigation Termination Date:

> a.    *investigate* the validity, perfection, and enforceability of the Pre-Petition Liens and the Pre-Petition Obligations as well as the junior liens held by UBE for the benefit of itself and the other UBE Secured Parties;
>
> b.    *be granted standing and authority* by the Court to file and prosecute an objection or claim related thereto; *and*
>
> c.    *file such objection or claim*.

(Final DIP Order ¶ 16).

52.    If the above process was not completed on or before the Investigation Termination Date, "the agreements, acknowledgments and stipulations contained in Paragraphs E and F" of the Final DIP Order became "*immediately and irrevocably binding* on the Debtors and the Debtors' estates, the Committee, and all parties-in-interest and any and all successors-in-interest thereto . . . ."  (Final DIP Order ¶ 16) (emphasis added).  And all such parties were

"forever barred from bringing any Challenge."  (*Id.*).  In addition, the Pre-Petition Obligations

and the UBE Obligations were deemed to be "***finally allowed claims***," and the Pre-Petition

Secured Parties and the UBE Secured Parties were released from "***any and all*** claims and causes

of action" related to the Pre-Petition Obligations or the UBE Obligations including "any claims

or defenses ***as to the extent, validity, priority, or enforceability***" of their liens.  (*Id.*) (emphasis

added).

54. Likewise, the Final DIP Order authorized the Debtors to pay the Defendants "in

cash upon the closing of a sale of Pre-Petition Collateral," with such payment subject to

disgorgement only if a Challenge asserted "***in accordance with the terms of [the] Final [DIP]***

***Order***" were ultimately sustained by the Court.  (Final DIP Order ¶ 28) (emphasis added).

54. In direct contravention of the requirements of the Final DIP Order, the Plaintiff

failed to undertake any investigation and did not seek standing and authority from the Court to

commence a Challenge.  Because the Plaintiff failed to satisfy the express requirements of the

Final DIP Order, the Plaintiff failed to commence a "Challenge" prior to the Investigation

Termination Date.  Consequently, the Debtors' stipulations and releases that were made for the

benefit of the Defendants went "immediately and irrevocably" into effect, and any arguments

concerning the validity of Defendants' liens or for disgorgement of the payment to the

Defendants were waived or otherwise barred.

**(ii)     The Plaintiff's Claims Are Estate Causes of Action That Required the Plaintiff to Obtain Derivative Standing.**

55. Because a challenge to secured lenders' liens is an estate cause of action under

Third Circuit law, the Plaintiff needed to obtain derivative standing to bring its claims, but has

failed to do so.[33]  The Plaintiff seeks to reallocate value from TWC Domestic to other Debtors, which would increase the proceeds available for creditors of those other Debtors.  This is a textbook example of a "general" cause of action that belongs to the estate.  *See, e.g.*, *In re Emoral, Inc.*, 740 F.3d 875, 881 (3d Cir. 2014) (holding that claims are estate property when they are based on facts "generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors").  And it is the Debtors who have "exclusive standing to assert causes of action that have become property of the estate by operation of § 541." *In re DSI Renal Holdings, Inc.*, 574 B.R. 446, 479 (Bankr. D. Del. 2017).

56.     While the Plaintiff vaguely asserts that it has a "direct stake" in the outcome of the Complaint, it fails to demonstrate how its alleged injury differs in any way from that of any other creditor in the Debtors' Chapter 11 Cases who stands to benefit from a decreased allocation to TWC Domestic.  (Compl. ¶¶ 7-8).  And even if the Plaintiff has standing in its individual capacity (which it does not), the Defendants' secured claims are finally and fully allowed claims pursuant to the Final DIP Order.  Specifically, per Paragraphs E(iii) and F(iii) of the Final DIP Order, the Defendants' claims "constitute allowed secured claims" against the applicable Debtors' estates.  (Final DIP Order ¶¶ E-F).

57.     Notably, commencing a proper and timely Challenge was not the Plaintiff's sole opportunity for disputing the validity and extent of the Defendants' liens or the Debtors'

---

[33]   Courts have consistently held that challenges to the validity of a secured lender's liens are estate causes of action for which derivative standing is required.  *See, e.g.*, *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *7 (Bankr. D. Del. Nov. 5, 2010) (stating that debtors ultimately own claims challenging the liens of their prepetition lenders, even in circumstances warranting a grant of derivative standing); *Official Comm. of Equity Security Holders v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 371 B.R. 660, 671 (S.D.N.Y. 2007) (same); *In re Exide Techs.*, 303 B.R. 48, 66-67 (Bankr. D. Del. 2003) (stating that a debtor could settle a creditors' committee's adversary proceeding challenging a prepetition lender's liens because the proceeding was an estate cause of action, but ultimately denying the proposed settlement as below the lowest reasonable outcome); *In re Tenn. Valley Steel Corp.*, 183 B.R. 795, 799-800 (Bankr. E.D. Tenn. 1995) (denying a creditors' committee standing to bring a claim to equitably subordinate the prepetition lender's liens on behalf of the debtor because the committee could not satisfy requirements for derivative standing).

Case 18-50486-MFW    Doc 18    Filed 09/07/18    Page 33 of 44

agreement to pay the Defendants.  The Plaintiff could have objected to entry of the Interim DIP

Order, which included similar stipulations and acknowledgements to those in the Final DIP

Order.  The Plaintiff could have objected to the entry of the Final DIP Order and the process set

forth therein for asserting a Challenge.  The Plaintiff could have appealed the entry of the Final

DIP Order before it became final and non-appealable.  The Plaintiff could have voiced its

concerns on the record at any of the eight (8) hearings it attended and participated in through the

entry of the APA Amendment Order.  It did ***none*** of those things**.**  Rather, the Plaintiff chose to

lie in wait and commence this Adversary Proceeding as a hold-up tactic when, in fact, the

Plaintiff is primarily secured only in equity and will not receive any recovery unless and until

general unsecured creditors are paid in full.

      58.    Courts consistently have applied *res judicata* to bar collateral attacks (such as

Plaintiff's here) on final DIP financing orders.  *See, e.g.*, *In re 11 E. 36th LLC*, 2016 WL 152924,

at *7 ("Courts have applied principles of res judicata to orders authorizing postpetition financing

in bankruptcy cases."); *In re SAI Holdings Ltd.*, No. 06-33227, 2012 WL 3201893 (Bankr. N.D.

Ohio Aug. 3, 2012) (applying *res judicata* to bar claims that proceeds paid to DIP lender in

accordance with a DIP financing order were subject to disgorgement); *Spartan Mills v. Bank of

Am. Ill.*, 112 F.3d 1251, 1256 (4th Cir. 1997) (*res judicata* barred untimely challenge to validity

of liens under final DIP financing order, because a creditor "cannot allow a final order that

deprives it of a lien position to stand and then hope to attack it collaterally at another time and in

another forum"); *In re Brooks Sand & Gravel, LLC*, 361 B.R. 477, 479 (Bankr. W.D. Ky. 2007)

("The Final Financing Order . . . prohibited challenges to the Bank's claims or liens in the

01:23611213.1

bankruptcy by any entity, provided no timely challenges to the liens were raised by the Trustee. The binding language . . . is *res judicata* precluding Cobalt's current action.").[34]

59.      The *SAI Holdings* case is instructive.  In that case, the bankruptcy court denied a creditor's motion to compel the debtors' DIP lender to disgorge certain proceeds, holding that *res judicata* barred the creditor from arguing that loans approved under the court's DIP order were unsecured and non-priority.  *See* 2012 WL 3201893 at *5, *9.  In *SAI Holdings*, Bank of America ("BofA") was the debtors' prepetition secured lender.  *Id.* at *1.  After the debtors filed chapter 11, BofA provided a DIP facility on a secured, superpriority basis to fund a going-concern sale.  *See id.*  However, after the debtors' largest customer moved its business to the debtors' competitors, ending any hope of a going-concern sale and triggering a "Termination Event" under the Final DIP Order, BofA informed the debtors that their right to make draws under the DIP line of credit had automatically terminated.  *Id.* at *2.  Despite this, BofA continued to lend funds to the debtors to enable an orderly liquidation.  *Id.*  Eventually, the debtors, BofA, and the creditors' committee filed a joint motion for approval of a supplemental DIP order under which BofA would fund a chapter 11 liquidation (the "Supplemental DIP Order").  *Id.*  The bankruptcy court entered the Supplemental DIP Order, which, among other things, retroactively approved and authorized the loans that BofA had made to the debtors after termination of the DIP line of credit.  *Id.*

---

[34]      *See also In re Patriot Contracting Corp.*, No. 05-33190 DHS, 2006 WL 4452840, at *3 (Bankr. D.N.J. Mar. 28, 2006) ("The doctrine of *res judicata* is applicable to final orders issued by a bankruptcy court, and has been held applicable to financing orders."), *aff'd sub nom. I.R.S. v. Patriot Contracting Corp.*, No. 06-2133 (JLL), 2007 WL 433392, at *3-4 (D.N.J. Feb. 7, 2007) (explaining that challenge to terms of final cash collateral order was "akin to an untimely appeal or motion for reconsideration"); *In re Target Indus., Inc.*, 328 B.R. 99, 115 (Bankr. D.N.J. 2005) ("Specifically, *res judicata* has been held applicable to financing orders, claims allowance orders, and confirmation orders.").

60.    A plan of liquidation was subsequently confirmed, and the liquidating agent began to wind down the debtors' estates, making a partial distribution to BofA, as the secured lender, with the proceeds from asset sales and litigation settlements and recoveries. *See id.* at *4–5. After these disbursements, an administrative creditor, Toncee, Inc. ("Toncee"), filed a motion to compel BofA to disgorge the liquidation proceeds it had received. *See id.* at *1. Toncee argued that the bankruptcy court could not have granted the debtors retroactive authority to borrow money and that, because the debtors were not authorized to borrow until entry of the Supplemental DIP Order, the loans that BofA had made after the Termination Event but prior to the Supplemental DIP Order had been made on an unsecured, non-priority basis. *See id.* at *1, *5.

61.    The court denied Toncee's motion, holding that approval of the challenged loans was *res judicata* by virtue of the Supplemental DIP Order. *See id.* at *7. The court further held that Toncee was represented at all of the hearings on the Supplemental DIP Order and thus "had the opportunity, and was required, to raise its objection . . . before entry of the Supplemental [DIP] Order." *Id.* at *6. Because it had failed to do so (and also did not appeal the order), "Toncee's challenge to the legal basis of the Supplemental [DIP] Order [was] barred by the doctrine of *res judicata*." *Id.* at *7.

62.    The *SAI Holdings* court further found that Toncee was estopped from challenging BofA's advances by virtue of the broad release granted to BofA under the Supplemental DIP Order. *See id.* In *11 E. 36th*, the bankruptcy court similarly held that exculpation provisions in a DIP financing order precluded third-party claims under principles of *res judicata*. In that case, the debtor brought an adversary proceeding against its prepetition lenders for certain alleged breaches of contract. The prepetition lenders, who had assigned their mortgages to the DIP

lender as part of the DIP financing package, brought a third-party complaint against such DIP

lender for contribution and indemnification. The DIP lender filed a motion to dismiss the third-

party complaint on the basis of *res judicata*, since the DIP financing order contained a provision

exculpating the DIP lender from "any liability for any claims arising from the prepetition or

postpetition activities of the Debtors in the operations of [their] business or in connection with

[their] restructuring efforts." 2016 WL 152924 at *7 (Bankr. S.D.N.Y. 2016). The court

dismissed the third-party complaint, finding that the prepetition lenders were aware of their

potential claims at the time of the DIP financing order and that failing to "at least highlight[] the

existence of their potential claims against the DIP Lender at the time the order was entered" was

"patently unreasonable" when the exculpation provision provided for release of any liability for

any claims. *Id.* at *11.

63.     The facts of this case are analogous to *SAI Holdings* and *11 E. 36th* because,

pursuant to the Final DIP Order, barring a valid, timely Challenge, which the Plaintiff failed to

bring,

> the Debtors . . . *released, waived, and discharged each of the Pre-Petition Secured Parties (whether in their prepetition or postpetition capacity) and the UBE Secured Parties . . . from any and all claims and causes of action* arising out of, based upon, or related to, in whole or in part, the Pre-Petition Obligations, the UBE Obligations, or their respective prepetition relationship with such Debtor or affiliate thereof relating to any of the Pre-Petition Loan Documents . . . *including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability* of the Pre-Petition Liens or the Pre-Petition Obligations, the UBE Obligations or any liens or security interests securing the UBE Obligations . . . .

(Final DIP Order ¶ 16) (emphasis added). Not only does the Final DIP Order exculpate the

Defendants from all claims, it explicitly does so for the Plaintiff's claims. Much like *In re 11 E.*

*36th LLC*, a judgment for the Plaintiff "would impair the [Defendants'] rights under the

exculpation provisions of [Paragraph 16] of the [Final DIP Order].  Thus, the claims are barred by *res judicata*."  2016 WL 152924 at *9.

64.    For these reasons, the Plaintiff is barred by the doctrine of *res judicata* from asserting Counts I-IV of the Complaint.[35]

## II.    THE PLAINTIFF LACKS STANDING TO BRING ANY OF THE CLAIMS ASSERTED IN THE COMPLAINT.

65.    As noted above, the Plaintiff's claims are estate causes of action, and the Plaintiff did not seek and does not have derivative standing to pursue such claims.  Even assuming for the sake of argument that the claims in the Complaint could be asserted directly, the Plaintiff lacks standing in its own right to do so.  Bankruptcy standing requires a party to meet "*both* the constitutional requirements for standing under Article III of the U.S. Constitution, as well as the statutory standing requirements put forth by the Bankruptcy Code in 11 U.S.C. § 1109(b)."[36]  *In re W.R. Grace & Co.*, 475 B.R. 34, 176 (D. Del. 2012) (emphasis added).  And a party lacks constitutional standing unless it can prove:  (1) an injury in fact that is concrete, distinct and palpable, and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that a favorable decision will redress the injury.[37]

66.    It is indisputable that "[p]laintiffs bear the burden of proving standing."  *ACLU-NJ v. Twp. of Wall*, 246 F.3d 258, 261 (3d Cir. 2001); *Lujan v. Defenders of Wildlife*, 504 U.S. at 561.  Far from demonstrating standing, the Plaintiff here excises the standing requirement from

---

[35]    *See Target Indus.*, 328 B.R. at 116 (applying *res judicata* to preclude a debtor's successor from challenging the validity of liens held by creditor and the releases granted under the DIP financing order because it was "patently unreasonable not to bring such claims, or at least highlight their existence, prior to the entry of the [DIP financing order]").

[36]    Section 1109(b) provides that a "party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter."  11 U.S.C. § 1109(b).

[37]    *In re Flintkote Co.*, 486 B.R. 99, 110–11 (Bankr. D. Del. 2012) (citing *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

its quotation of the Final DIP Order,[38] stating, without support, that it has "standing to make this challenge without leave of Court."  (Compl. ¶ 8).  *But cf.* (Final DIP Order ¶ 16) (ordering that a party's ability "to file and prosecute an objection or claim related thereto (each, a 'Challenge')" was expressly "***subject . . . to being granted authority and standing by th[e] Court***" (emphasis added)).

67.    While the Plaintiff vaguely asserts that it is "an aggrieved party-in-interest with standing to make this challenge without leave of Court,"[39] it cannot establish that it suffered an actual injury or that it is likely that a favorable decision would redress the supposed injury.  *See In re Flintkote Co.*, 486 B.R. at 110–11.  Case law is clear that where a plaintiff's possibility for relief is "entirely speculative" and dependent on numerous contingencies, an alleged injury is not "actual and imminent," and a favorable decision is not likely to "redress the injury."[40]  Thus, demonstrating standing "requires the plaintiff to show that it is *likely*, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[41]

68.    The Delaware bankruptcy court in *Flintkote* considered an unresolved objection to plan confirmation, and the parties extensively briefed the issue of whether the objector had standing to raise its objections.  *In re Flintkote Co.*, 486 B.R. at 110.  The bankruptcy court ruled that, as an initial matter, the objector needed to satisfy the requirements for Article III standing.

---

[38]  (Compl. ¶ 26) (quoting to Final DIP Order but omitting language stating that a party's ability "to file and prosecute an objection or claim related thereto (each, a 'Challenge')" was expressly "subject . . . to being granted authority and standing by th[e] Court").

[39]  (Compl. ¶ 8).

[40]  *In re Flintkote Co.*, 486 B.R. at 115; *see also Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013) (holding that a "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending"); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 365 (3d Cir. 2014) (explaining that a "'chain of contingencies' amounting to 'mere speculation' is insufficient for an injury-in-fact" (quoting *Clapper*, 568 U.S. at 410)).

[41]  *Hassan v. City of New York*, 804 F.3d 277, 293 (3d Cir. 2015) (emphasis added) (citation and internal quotation marks omitted); *see also Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  (citation and internal quotation marks omitted)).

*Id.*  After reviewing applicable Third Circuit case law, the bankruptcy court found that the mere fact that the objector filed a proof of claim was not enough to confer standing:  the injury asserted was "far from imminent," and the possibility of relief on the claim was simply too speculative.  *Id.* at 115.  The bankruptcy court found that at least five contingencies would have to be satisfied before the objector could allege an injury-in-fact, which would, in turn, impact whether the objector even had a chance at recovery from the debtors.  *Id.*  As the bankruptcy court wrote, "Whether or not all these events will come to pass at some time in the future is entirely speculative.  Thus, the alleged injury is simply not 'actual and imminent.'"  *Id.*  In other words, the possibility for recovery of damages was simply too remote for the bankruptcy court to confer standing.  *Id.*

69.      Here, the Plaintiff's Complaint does not even allege an actual injury—only a supposition that the Plaintiff may have been injured *if* the allocation of value to the Defendants' collateral resulted in a misallocation of sale proceeds.[42]  But the Plaintiff does not allege either that (i) the Defendants' liens are invalid or (ii) that the sale proceeds received by the Defendants exceeded the value of the Defendants' collateral.  The Complaint thus does not come remotely close to carrying the Plaintiff's burden of establishing standing.

70.      But not even the potential injury alleged by the Plaintiff satisfies its fundamental burden of establishing standing because the possibility of any recovery is far too attenuated.  Specifically, for the Plaintiff to have any chance of recovery, the following "chain of contingencies" would *all* have to occur:

      a.  The Plaintiff would have to prevail on summary judgment, despite (i) its clear failure to assert a Challenge in compliance with the Final DIP Order and (ii) the plain language of the Sale Order providing that

---

[42]      (*See generally* Compl. ¶¶ 6–7).

the allocation to the Defendants was binding on all parties in interest (*See* Sale Order ¶ 62; APA § 2.7(i));

b. The Plaintiff would be required to establish, in a lengthy and expensive valuation trial, that (i) the value of the Defendants' collateral on the Closing Date was less than the sale proceeds received by the Defendants and, further, that (ii) there is some basis, which the Plaintiff has yet to articulate, for re-allocating a sufficient portion of the proceeds away from TWC Domestic and toward the Debtor entities for which the Plaintiff holds a lien on the equity;

c. The Plaintiff would be required to establish, in another lengthy and expensive trial, that the Pre-Petition Agent's collateral has not diminished in value since the Petition Date, given that any diminution in the value of the Pre-Petition Agent's collateral would be secured by Adequate Protection Liens and Superpriority Claims that are (i) paid before the Plaintiff and (ii) payable from nearly any asset pool (*i.e.*, not limited to TWC Domestic) (*See* Final DIP Order ¶¶ M, 10, 12);

d. The Plaintiff would be required to establish that all of the above proceedings have not exhausted the funds allocated for distribution to WGFC and Weinstein Television LLC, given that (i) the Debtors and their estates bear the full cost of MUFG's professional fees incurred in connection with these litigations and (ii) any amounts paid to lender professionals are not subject to avoidance, disgorgement or any similar form of recovery by the Debtors or any other person (*See* Final DIP Order ¶ 8; DIP Credit Agreement § 13.04; Sale Order ¶ 9);

e. Given that the Plaintiff is secured in the equity of WGFC and Weinstein Television LLC, the Plaintiff would further be required to establish that any proceeds available for distribution to those entities after all of the above are more than enough to pay, in full, those higher priority secured claims, as well as those Debtors' proportionate shares of all DIP obligations, administrative claims, and unsecured claims (including intercompany claims, tort claims, and other claims);

f. The Plaintiff would further be required to establish that its interest in WGFC's rights to certain "Foreign Film Rights Collateral" (i) is not voidable as a fraudulent conveyance and (ii) is valuable enough to provide a recovery for the Plaintiff; and

g. Finally, if the Plaintiff can establish that any proceeds allocable to WGFC and Weinstein Television LLC are left ***after all of the above***, only then may the Plaintiff receive a recovery.

71.    Therefore, given that the Plaintiff's theory of standing necessarily depends on such a "chain of contingencies," as in *Flintkote*, its alleged injury amounts to "mere speculation" insufficient to carry the Plaintiff's burden to demonstrate its standing here.  While the Plaintiff purports to seek to increase the proceeds available for all creditors (a derivative claim constituting an estate cause of action), the fact of the matter is the Plaintiff stands to be affected very little, if at all, by the success or failure of its Complaint, the cost of which will be borne by the Debtors and their estates through their Court-approved agreement to pay MUFG's professional fees, potentially harming every creditor but the Plaintiff.  The Plaintiff's claims should therefore be dismissed as a matter of law for lack of standing.[43]

## III.    COUNTS III AND IV ARE ALSO MOOT OR OTHERWISE BARRED BECAUSE THE DEFENDANTS' CLAIMS ARE ALLOWED UNDER THE FINAL DIP ORDER, THE DEBTORS AMENDED THEIR SCHEDULES, AND THERE IS NO BAR DATE ESTABLISHED IN THESE CASES.

72.    Pursuant to Counts III and IV, the Plaintiff asserts that the Defendants' claims should be disallowed because (i) they were scheduled as unliquidated and/or contingent claims and (ii) the Defendants did not file proofs of claim.  (Compl. ¶¶ 46-48, 51-52).  In addition to the reasons stated above, summary judgment is warranted with respect to these counts for several additional reasons.  First, as discussed *supra*, the Defendants' claims are fully allowed and are not subject to objection or avoidance, pursuant to the Final DIP Order.  Second, since the Complaint was filed, the Debtors amended their Schedules to reflect that the Defendants hold liquidated, non-contingent claims.[44]  Third, a bar date has not been established in the Debtors'

---

[43]    *See, e.g.*, *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (finding that, in the context of a motion to dismiss, "[a]bsent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed").

[44]    It is a well-established principle that creditors holding claims scheduled pursuant to 11 U.S.C. § 521(1) that are not identified as disputed, contingent, or unliquidated are not obligated to file a proof of claim. Fed. R. Bankr. P. 3003(b)(1) ("The schedule of liabilities filed pursuant to § 521(l) of the Code shall constitute **prima facie**

Chapter 11 Cases.  Accordingly, Counts III and IV are moot or are otherwise barred, and summary judgment should be granted in favor of the Defendants with respect to these counts.

IV.     **COUNTS V AND VI ARE ALSO MOOT OR OTHERWISE BARRED BECAUSE THE PLAINTIFF IS PRECLUDED BY THE COURT'S ORDERS FROM SEEKING DISGORGEMENT FROM THE DEFENDANTS.**

73.     Pursuant to Counts V and VI, the Plaintiff also seeks disgorgement of the Sale proceeds from the Defendants to the extent they received any value in excess of their interest in TWC Domestic subject to a valid, perfected, and enforceable lien.  For the reasons set forth above, the Plaintiff is barred by operation of *res judicata* from challenging the validity of the Defendants' liens or from contesting the validity of the allocation set forth in the Sale Order because, among other reasons, the Plaintiff failed to assert a timely Challenge in accordance with the Final DIP Order and because it lacks standing to pursue such claims.  Consequently, the Plaintiff is also barred from seeking any disgorgement from the Defendants.  Accordingly, Counts V and VI are moot or are otherwise barred, and summary judgment should be granted in favor of the Defendants with respect to these counts.

---

**evidence of the validity and amount of the claims of creditors**, unless they are scheduled as disputed, contingent, or unliquidated." (emphasis added)); *In re Nortel Networks, Inc.*, 531 B.R. 53, 62 n.28 (Bankr. D. Del. 2015) (noting that only creditors whose claims are not scheduled or whose claims are scheduled as disputed, contingent, or unliquidated must file proofs of claim prior to the claims bar date in order to preserve their claims); *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 545 n.11 (D. Del. 2005) (same); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1135 (2d Cir. 1994) ("Although mere listing of liabilities on the Schedules filed under Section 521(1) does not amount to a concession that such claims are valid, the liabilities will be deemed 'prima facie evidence of the validity and amount of the claims of creditors' unless they are listed as 'disputed, contingent, or unliquidated.'" (citing Fed. R. Bankr. P. 3003(b)(1))).

**<u>CONCLUSION</u>**

Through its Complaint, the Plaintiff purports to act as a crusader to increase recoveries in these Chapter 11 Cases, but its transparent litigation tactic will only serve to deplete recoveries for general unsecured creditors.  Its misguided efforts, which are barred by final, non-appealable orders of the Court, will only serve to distract all interested parties from the important tasks necessary to fully administer these Chapter 11 Cases.  For the foregoing reasons, the Court should grant the Summary Judgment Motion in its entirety.

*[Remainder of page intentionally left blank]*

01:23611213.1

38

Dated: September 7, 2018
Wilmington, Delaware

*/s/ Sean M. Beach*

Robert S. Brady, Esq. (No. 2847)
Sean M. Beach (No. 4070)
Michael S. Neiburg (No. 5275)
Elizabeth S. Justison (No. 5911)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email: rbrady@ycst.com
         sbeach@ycst.com

*Counsel to Defendants*

-and-

SIDLEY AUSTIN LLP
Jennifer C. Hagle, Esq. (*pro hac vice*)
Ariella Thal Simonds, Esq. (*pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:   (213) 896-6600
Email: jhagle@sidley.com
         asimonds@sidley.com

*Counsel to Defendant MUFG Union Bank, N.A.*

-and-

KATTEN MUCHIN ROSENMAN LLP
William B. Freeman (*pro hac vice*)
Jerry L. Hall (*pro hac vice*)
515 South Flower Street
Suite 1000
Los Angeles, California 90071-2212
Telephone:  (212) 940-8800
Facsimile:  (212) 940.8776
Email: bill.freeman@kattenlaw.com
         jerry.hall@kattenlaw.com

*Counsel to Defendant UnionBanCal Equities, Inc.*

01:23611213.1

39