## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>THE WEINSTEIN COMPANY HOLDINGS,<br>LLC, *et al.*,[1]<br><br>Debtor.<br><br>-------------------------------------------------------<br>In re:<br><br>AI INTERNATIONAL HOLDINGS (BVI) LTD.,<br><br>        Plaintiff,<br><br>   v.<br><br>MUFG UNION BANK, N.A.; as administrative<br>and collateral agent and UNION BANCAL<br>EQUITIES, INC.<br><br>        Defendants. | Chapter 11<br><br>Case No. 18-10601 (MFW)<br><br><br><br>Adv. Pro. No. 18-50486 (MFW)<br><br>**Reply Deadline:  October 19, 2018**<br>**Hearing:  TBD at the Discretion of the Court** |

## AI INTERNATIONAL HOLDINGS (BVI) LTD.'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

[1]  The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837).  The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013.  Due to the large number of debtors in these cases ("Debtors"), which are being jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://dm.epiq11.com/twc.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     NATURE AND STAGE OF PROCEEDING ......................................................3

III.    SUMMARY OF ARGUMENT ...........................................................................3

IV.     STATEMENT OF FACTS ....................................................................................7

    A.      The Weinstein Companies, AI International, and the Loan Documents .................7

    B.      DIP Loan ................................................................................................9

V.      ARGUMENT ......................................................................................................12

    A.      Summary Judgment Standard ..............................................................................12

    B.      AI International's Complaint Properly Asserts Challenges Within the Scope of the Final DIP Order...........................................................................13

        1.      AI Had Standing to Bring Its Challenges Without Leave of Court ...........14

            i.      AI International Has Standing to Object to Union Bank's Secured Status Under Section 506 of the Bankruptcy Code..........14

            ii.     AI International Has Standing to Object to Defendants' Claim Under Section 502 of the Bankruptcy Code ......................16

            iii.    AI International's Challenges Do Not Assert Claims of the Estate ............................................................................................18

        2.      The Final DIP Order Does Not Require a Party to Complete an Investigation Before Making a Challenge ..................................................19

        3.      The Complaint Was Timely Filed..............................................................20

    C.      *Res Judicata* Is Not Applicable When AI International Had Standing to Bring its Challenges ............................................................................................20

    D.      Neither the Sale Order nor the APA Precludes AI International from Bringing Challenges and Seeking Disgorgement Pursuant to the Final DIP Order .....................................................................................................................24

    E.      The Court Should Resolve Any Ambiguity in the Sale Order in a Way that Preserves the Challenge Remedy Under the Final DIP Order..............................30

    F.      The Doctrine of *Res Judicata* With Respect to the Sale Order Does Not Bar AI International's Complaint ........................................................................31

    G.      AI International Satisfies the Standing Requirements of Article III and Section 1109 of the Bankruptcy Code .................................................................32

VI.     CONCLUSION...................................................................................................35

## **TABLE OF AUTHORITIES**

**Page**

### Cases

*In re 11 E. 36th LLC*,
    No. 13-11506(JLG), 2016 WL 152924 (Bankr. S.D.N.Y. Jan. 12, 2016)........................ 20, 21

*In re 3333 Main, LLC*,
    No. 13-51533, 2014 WL 2338273 (Bankr. D. Conn. May 29, 2014).................................... 17

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
    No. CV 16-453-RGA, 2018 WL 4109231 (D. Del. Aug. 28, 2018)........................................ 12

*ACLUNJ v. Twp. of Wall*,
    246 F.3d 258 (3d Cir. 2001).............................................................................................. 33

*Adair v. Sherman*,
    230 F.3d 890, 894 n.3 (7th Cir. 2000) ................................................................................ 16

*In re Aerogroup Int'l Inc.*,
    No. 17-11962(KJC), 2018 WL 3155250 (Bankr. D. Del. June 25, 2018)........................ 12, 13

*Am. Eagle Outfitters v. Lyle & Scottt Ltd.*,
    584 F.3d 575 (3rd. Cir. 2009) ............................................................................................ 25

*Am. LaFrance v. RT Jedburg Commerce Park, LLC (In re Am. LaFrance, LLC)*,
    461 B.R. 267 (Bankr. D. Del. 2011) ................................................................................... 25

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................................... 12

*Assocs. Commercial Corp. v. Rash*,
    520 U.S. 953 (1997)........................................................................................................... 15

*In re Barrios*,
    257 B.R. 626 (Bankr. S.D. Fla. 2000) .......................................................................... 14, 15

*In re Brooks Sand & Gravel, LLC*,
    361 B.R. 477 (Bankr. W.D. Ky. 2007) ................................................................................ 23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................... 12

*In re Centaur, LLC*,
    No. 10-10799 KJC, 2010 WL 4624910 (Bankr. D. Del. Nov. 5, 2010) ................................ 19

*In re Charter Co.*,
    68 B.R. 225 (Bankr. M.D. Fla. 1986) ................................................................................. 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................................................... 33

*In re Columbia Gas Sys., Inc.*,
    146 B.R. 106 (D. Del. 1992)............................................................................................... 25

*Constitution Party of Pa. v. Aichele*,
   757 F.3d 347 (3d Cir. 2014)..................................................................... 33

*In re Coudert Bros.*,
   487 B.R. 375 (S.D.N.Y. 2013)................................................................. 25

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017).............................................................................. 34

*Dewsnup v. Timm*,
   502 U.S. 410 (1992)................................................................................ 14

*United States v. Diebold, Inc.*,
   369 U.S. 654 (1962)................................................................................ 13

*In re DSI Renal Holdings, Inc.*,
   574 B.R. 446 (Bankr. D. Del. 2017) ...................................................... 18

*In re Dynegy Inc.*,
   486 B.R. 585 (Bankr. S.D.N.Y. 2013) ................................................... 25

*Edelman Arts, Inc. v. Art Int'l (UK) Ltd.*,
   841 F. Supp. 2d 810 (S.D.N.Y. 2012).................................................... 26

*In re Emoral, Inc.*,
   740 F.3d 875 (3rd Cir. 2014) ................................................................. 18

*Enter. Energy Corp. v. U.S. (In re Columbia Gas Sys., Inc.)*,
   50 F.3d 233 (3d Cir. 1995)...................................................................... 25

*Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.)*,
   799 F.2d 91 (3d Cir. 1986)................................................................. 14, 15

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ........................................................ 19

*In re Flintkote Company*,
   486 B.R. 99 (Bankr. D. Del. 2012) .................................................... 32, 33

*Gaglia v. First Federal Savings & Loan Association*,
   889 F.2d 1304 (3d Cir. 1989).................................................................. 14

*In re Glob. Indus. Techs., Inc.*,
   645 F.3d 201 (3d Cir. 2011).................................................................... 33

*GRT, Inc. v. Marathon GTF Tech., Ltd.*,
   No. CIV.A 5571-CS, 2012 WL 2356489 (Del. Ch. June 21, 2012) ................ 27, 30

*Hartford Holdings, LLC v. Mladen (In re Eternal Enter., Inc.)*,
   558 B.R. 47 (Bankr. D. Conn. 2016) ..................................................... 18

*Hassan v. City of New York*,
   804 F.3d 277 (3d Cir. 2015).................................................................... 33

*In re Heritage Highgate, Inc.*,
   679 F.3d 132 (3d Cir. 2012).................................................................... 15

*IFM Therapeutics, Inc. v. Lycera Corp.*,
   No. CV 17-608-LPS, 2018 WL 4223192 (D. Del. Aug. 31, 2018) ........................ 12

*Lamont v. New Jersey*,
   637 F.3d 177 (3d Cir. 2011)................................................................................. 12

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*,
   424 F.3d 195 (2d Cir. 2005)............................................................................... 26

*Lefkowitz v. Michigan Trucking, LLC (In re Gainey Corp.)*,
   447 B.R. 807 (Bankr. W.D. Mich. 2011), *aff'd*, 481 B.R. 264
   (B.A.P. 6th Cir. 2012)........................................................................................ 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)........................................................................................... 33

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
   842 F. Supp. 2d 682 (S.D.N.Y. 2012)................................................................ 26

*Newhall Land Farming Co. v. Am. Heritage Landscape, LP (In re LandSource Comtys. Dev. LLC)*,
   476 B.R. 454 (Bankr. D. Del. 2012) .................................................................. 13

*Official Comm. of Equity Security Holders v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*,
   371 B.R. 660 (S.D.N.Y. 2007)........................................................................... 18

*In re Outer Harbor Terminal, LLC*,
   Case. No. 16-10283 (LSS) [D.I. 690] (Bankr. D. Del. May 5, 2017)........................ 25, 28, 30

*In re Patriot Contracting Corp.*,
   No. 05-33190 DHS, 2006 WL 4452840 (Bankr. D.N.J. Mar. 28, 2006)................................ 23

*Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank N.A.*,
   816 F.3d 373 (4th Cir. 2016) ..................................................................... 22, 23, 31

*Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co., Inc)*,
   402 B.R. 502 (Bankr. D.N.H. 2009) .................................................................. 24

*In re SAI Holdings Ltd.*,
   No. 06-33227, 2012 WL 3201893 (Bankr. N.D. Ohio Aug. 3, 2012)........................ 20, 21, 22

*Schering Corp. v. Food & Drug Admin.*,
   51 F.3d 390 (3d Cir. 1995)................................................................................. 34

*Solus Alt. Asset Mgmt. LP v. Delphi Auto. PLC (In re DPH Holdings Corp.)*,
   553 B.R. 20 (Bankr. S.D.N.Y. 2016) ................................................................ 25

*Spartan Mills v. Bank of Am. Ill.*,
   112 F.3d 1251 (4th Cir. 1997) ........................................................................... 23

*Taliaferro v. Darby Twp. Zoning Bd.*,
   458 F.3d 181 (3d Cir. 2006)............................................................................... 33

*In re Target Indus., Inc.*,
   328 B.R. 99 (Bankr. D.N.J. 2005) ..................................................................... 23

*In re Tenn. Valley Steel Corp.*,
   183 B.R. 795 (Bankr. E.D. Tenn. 1995) ................................................................ 19

*In re Trico Marine Servs., Inc.*,
   450 B.R. 474 (Bankr. D. Del. 2011) ................................ 24, 25, 26, 27, 28, 30

*UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*,
   660 F.3d 643 (2d Cir. 2011) ............................................................................ 26

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ............................................................................ 33

*Whitmore v. Ark.*,
   495 U.S. 149 (1990) ...................................................................................... 33

*In re Williamson*,
   43 B.R. 813 (Bankr. D. Utah 1984) ............................................................ 17

*Winget v. JP Morgan Chase Bank. N.A.*,
   537 F.3d 565 (6th Cir. 2008) .................................................................. 22, 31

## Rules / Statutes

11 U.S.C. § 501 ...................................................................................... 16, 17, 18

11 U.S.C. § 502 .............................................................................. 1, 3, 16, 17, 18

11 U.S.C. § 506 ...................................................................... 1, 3, 13, 14, 15, 18

11 U.S.C. § 521(A)(1) ...................................................................................... 18

11 U.S.C. § 1106(a)(2) ...................................................................................... 18

11 U.S.C. § 1109 .......................................................................................... 16, 32

11 U.S.C. § 1111(a) .................................................................................... 17, 18

Fed. R. Bankr. P. 3001 ...................................................................................... 32

Fed. R. Bankr. P. 7056 ...................................................................................... 12

Fed. R. Bankr. P. 9006(a)(1)(C) .................................................................. 4, 10

Fed. R. Civ. P. 56 ............................................................................................ 12

## Other Authorities

United States Constitution Article III ................................................................ 33

4 COLLIER'S ON BANKRUPTCY ¶ 501.01 (15th ed., 2003) .............................. 17

4 COLLIER'S ON BANKRUPTCY ¶ 506.03 (16th ed., 2018) .............................. 15

AI International Holdings (BVI) LTD., ("AI International") by and through its

undersigned counsel hereby submits this opposition brief ("Opposition") to the Motion for

Summary Judgment ("Summary Judgment Motion" or "MSJ") filed by Defendants MUFG

Union Bank, N.A. ("MUFG" or the "Pre-Petition Agent") and UnionBankCal Equities, Inc.

("UBE" and, together with the Pre-Petition Agent, the "Defendants").

## I.    INTRODUCTION

The Summary Judgment Motion should be denied.  The Complaint asserts "Challenges"

precisely as prescribed in paragraph 16 of the Final DIP Order.  *See* Neiburg Declaration [Adv.

D.I. 19] Ex. 1 (the "Final DIP Order").[2]  The Complaint challenges the proposed findings in

paragraphs E and F of the Final DIP Order that the Defendants hold "allowed secured claims,"

*see* Final DIP Order at E(iii)(f) (MUFG) and F(iii)(f) (UBE), and other findings respecting

Defendants' claims and liens.  The Complaint asserts Challenges based on relief AI International

may seek in its own right as a creditor and party-in-interest:  (a) a determination of the secured

status of Defendants' claims under section 506 of the Bankruptcy Code (Counts I & II); and (b)

whole or partial disallowance of Defendants' claims under section 502 of the Bankruptcy Code

(Counts II & III).  The Complaint does *not* assert Challenges based on avoidance powers or other

remedies belonging to the estate.  Lastly, the Complaint was timely brought before the June 2,

2018 deadline set forth in the Final DIP Order.  Contrary to the Defendants' position, paragraph

16 required nothing more for AI International to proceed.

AI International's compliance with paragraph 16 of the Final DIP Order is fatal to the

Summary Judgment Motion.  What remains is discovery and trial on the merits of the Complaint,

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Summary Judgment Motion or the Complaint.

and, based on the Court's resolution of the Challenges, determination of the amount, if any, that Defendants must disgorge from the payments they received at the closing of the Sale.

Unwilling to face adjudication on the merits, Defendants argue that this Court has no power to take evidence and adjudicate the value of the film distribution rights pledged to Defendants. Instead, they say the APA and the Sale Order indirectly and implicitly determined they have allowed secured claims—without any shred of evidence, not even a filed proof of claim, and even though the challenge period of the Final DIP Order had yet to run.

Fundamental rules of interpretation prove that the Defendants' reading of the operative orders is wrong. The Final DIP Order and the Sale Order at issue should be each read in the context of their respective purpose, harmonized with one another, and interpreted to avoid surplusage. The context of the APA and Sale Order was approval of the Sale and authorization of the closing. It did not address the allowance or determination of the secured status of Defendants' claims. The process for allowance and determination of the secured status of Defendants' claims was specifically addressed in the Final DIP Order—which authorized timely Challenges to the allowance and secured status of Defendants' claims even after the approval and closing of the Sale. In this context, the terms of the APA are addressing "allocation" of the cash to be paid, at what amount of the Sale proceeds, at the closing. The APA does not address the allowance of claims, and certainly does not supersede the Challenge provisions put in place by the Final DIP Order contemplating that the payments at the closing would be disgorged upon a successful Challenge.

The Defendants' proposed interpretation of the APA and Sale Order would mean that the right to make a timely Challenge terminated merely because the Sale closed. This would render

the post-closing disgorgement remedy of the Final DIP Order entirely meaningless, and should be rejected for that reason alone.

As will be demonstrated below, the Defendants have failed to establish their entitlement to cut off AI International's Challenges under the summary judgment standards of this District. The Summary Judgment Motion must be denied.

## II.    NATURE AND STAGE OF PROCEEDING

On March 19, 2018 (the "Petition Date"), Weinstein Company Holdings LLC ("Holdings") and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Cases").  The official committee of unsecured creditors ("Committee") was appointed on March 28, 2018.

On June 2, 2018, AI International commenced the above-captioned adversary proceeding (the "Adversary Proceeding") by filing a complaint with this Court: (i) seeking a determination as to the extent of Defendants' liens on the Debtors' property under 11 U.S.C. §506; (ii) objecting to Defendants' claims under 11 U.S.C. §502 (the Counts in (i) and (ii), together, the "Challenges"); and (iii) seeking declaratory relief as to the amount of Sale proceeds required to be disgorged by the Defendants under the Final DIP Order if either or both Challenges are successful (the "Complaint") [Adv. D.I. 1].

On August 27, the Defendants filed the *Answer and Affirmative Defenses of Defendants MUFG Union Bank, N.A. and UnionBanCal Equities, Inc*. [Adv. D.I. 13].

On September 7, 2018, the Defendants filed the Summary Judgment Motion.

The pre-trial conference in the Adversary Proceeding is set for October 16, 2018.

## III.    SUMMARY OF ARGUMENT

Defendants are lenders or agents of lenders under the Debtors' debtor-in-possession financing.  As is typical in large Chapter 11 cases, the lenders under the DIP facility demanded

that the Court make extensive findings as to their pre-petition loans—including that their claims should be allowed and deemed fully secured.  Unlike a typical case, however, the collateral for the various secured claims in these cases was "siloed" across the various Debtors' estates and across various categories of assets.  Defendants' pre-petition claims, for example, were secured only by the domestic rights in certain films, and none of the other highly valuable businesses and assets included in the Sale.  Most importantly, the Defendants' claims were *not* secured by the Debtors' lucrative television production business, characterized by the Debtor's Chief Restructuring Officer as ". . . one of the most successful television production companies in the industry."  *See* Declaration of Robert Del Genio in Support of First Day Relief ("Del Genio Decl.), ¶13. [D.I. 7].

The Court approved the proposed DIP financing with the requested findings.  The Final DIP Order delayed the effectiveness of the findings, however, and afforded parties-in-interest with the opportunity to challenge any and all of them by filing appropriate pleadings by June 4, 2018.  Final DIP Order ¶ 16; MSJ ¶ 16.[3]  Parties-in-interest were not limited in the nature of the challenges they could bring – and, in particular, potential challenges were not limited to avoidance powers or other remedies of the Debtors' estates.  The Final DIP Order also provided that if a Challenge was successful, Defendants could be compelled to disgorge payments received at the Sale closing.  Final DIP Order ¶ 28.  Since the cases were on a "fast track" to a sale of substantially all of the Debtors' assets, this was essential to give the Challenge remedy meaning.

---

[3]  The deadline in the Final DIP Order fell on a weekend.  The deadline was extended to Monday, June 4, by operation of Bankruptcy Rule 9006(a)(1)(C).

On June 2, 2018, AI International filed the Complaint.    Counts I to II seek a determination of the secured status of Defendant's claims.    Counts III to IV of the Complaint seek disallowance of the Defendants' claims.    These challenge the proposed findings that the Defendants have "allowed secured claims," and that the documentation for their claims is proper and enforceable, and are therefore "Challenges" within the meaning of the Final DIP Order. Counts V to VI seek a determination of the amount that must be disgorged pursuant to the Final DIP Order if the Challenges are successful, as is expressly contemplated in the Final DIP Order.

Defendants assert that they are entitled to summary judgment on the Challenges asserted in the Complaint.  Defendants are wrong, for these reasons:

- The Complaint properly asserts Challenges within the scope of the Final DIP Order:

    o The Complaint challenges the findings in paragraphs E and F that Defendants have allowed secured claims, and the various other findings respecting the adequacy of the documentation for their claims.

    o The Complaint challenges Defendants claims and secured status through an objection to allowance under section 502 of the Bankruptcy Code and a determination of the secured status of Defendants' claims under section 506 of the Bankruptcy Code.

    o AI International was not required to seek leave of court to assert the Challenges.  As a creditor and party in interest, it has standing to object to, and seek a determination of the secured status of, Defendants' claims, in its own right.  The Challenges do not rely in any way upon the avoidance powers of the estate.

    o The Final DIP Order provided an opportunity for parties-in-interest to investigate the basis for Challenges if they wished.  It does not require that a party-in-interest do so, nor would it have been feasible to complete a valuation of the Debtors' domestic film rights collateral prior to the deadline to challenge the secured status of Defendants' claims.

- The Challenges are not precluded by the terms of the APA and Sale Order.  To the contrary, the Final DIP Order and the Sale Order are unambiguous and consistent:

- o The Final DIP Order unambiguously provides for Challenges to continue to be available after the closing of the Sale. In particular it provides a remedy of disgorgement if a Challenge is successful after the Lenders are paid.

- o The Sale Order includes no language restricting or modifying the Challenge provisions of the Final DIP Order.

- o The Sale Order has no language allowing the claims of Defendants or determining the secured status of their claims.

- o The natural meaning of the terms "allocate" and "allocation" in the context of the APA and Sale Order was the disposition of the proceeds of the Sale, not a determination of the value of Defendants' collateral.

- To the extent the Court would find the APA or Sale Order ambiguous, and potentially in conflict with the Final DIP Order, it should resolve the ambiguity to preserve the express rights of the Final DIP Order.

  - o Interpreting "allocation" to mean a final determination of the secured status of Defendants' claims would be inconsistent with the Final DIP Order.

    - ▪ The Final DIP Order, unlike the Sale Order, includes the Court's findings as to the allowance and secured status of Defendants' claims.

    - ▪ Defendants offered no evidence to support the allowance of their claims and the valuation of their collateral in connection with the Sale Order.

    - ▪ The Sale Order did not shorten the period to make a Challenge nor otherwise modify the Challenge provisions of the Final DIP Order.

    - ▪ Interpreting the term "allocation" to include implied findings as to the allowance and secured status of Defendants' claims would render the Challenge provisions and disgorgement terms meaningless.

  - o Because the Challenges were made in a manner consistent with the Sale Order, they do not require reconsideration or modification of the Sale Order, nor are they barred by the doctrine of *res judicata*. Nor was it necessary for AI International to object to or appeal from the Sale Order, since its Challenge rights under the Final DIP Order were expressly drawn to survive the closing.

Defendants are wrong to believe their claimed status as fully secured creditors would never be made subject to adjudication by this Court based on a full record of competent evidence. Their sense of entitlement to just such an unfair result is palpable in their papers. But it is contrary to the agreed language of the Final DIP Order, and contrary to how issues of valuation and claims allowance are ordinarily addressed, and should be addressed, before this Court.

For all these reasons, the Summary Judgment Motion should be denied.

## IV.    STATEMENT OF FACTS

### A.    The Weinstein Companies, AI International, and the Loan Documents

1.    Holdings is the parent holding company of, among others, Weinstein Television, LLC ("WTV"), The Weinstein Company, LLC ("TWC"), and TWC Borrower 2016, LLC ("TWC Borrower"). TWC is the parent company of Weinstein Global Film Corp. ("WGFC") and TWC Domestic, LLC ("TWC Domestic") WTV, TWC, TWC Borrower, WGFC, and TWC Domestic are all Debtors in these Cases.

2.    AI International is the lender under a Secured Full Recourse Promissory Note dated as of September 29, 2016 (as amended, modified, or supplemented, the "AI International Note"). A copy of the AI International Note is attached as Exhibit A (Exhibit 1 to AI International's Proof of Claim Against The Weinstein Company Holdings LLC) to the Declaration of Bennett Murphy filed concurrently herewith (the "Murphy Decl."). Pursuant to the AI International Note, AI International agreed to loan $45 million to TWC Borrower ("AI International Loan"). The AI International Note is guaranteed by Holdings and Harvey Weinstein pursuant to a Guarantee dated September 29, 2016 by Holdings and a Guarantee dated September 29, 2016 by Harvey Weinstein (collectively, "AI International Guarantees"). The AI International Guarantees are attached as Murphy Decl. Ex. E. *Id.* The AI International Loan is secured by a Pledge and Security Agreement dated September 29, 2016 ("AI International PSA")

with TWC, Holdings and WGFC, which provides as collateral: i) all of TWC's rights, title, and interest in all issued and outstanding capital stock of WGFC; ii) all of Holdings' right, title, and interest in all issued and outstanding membership interests in WTV; and iii) WGFC's right, title, and interest in the distribution and exploitation rights to the "Foreign Film Rights Collateral" as defined in the AI International PSA.  The AI International PSA is attached as Murphy Decl. Ex. A (Exhibit 2 to AI International's Proof of Claim Against The Weinstein Company Holdings LLC).

3.      Each of Holdings and TWC scheduled AI International as a secured creditor holding a contingent and unliquidated, but undisputed claim ("Holdings Schedule D" and "TWC Schedule D").  [D.I.s 299, 320].  TWC Borrower scheduled AI International as a secured creditor holding a contingent and unliquidated, but undisputed, claim of $45,528,134.18 ("TWC Borrower Schedule D").

4.      AI International filed proofs of claims ("POCs") against Holdings, TWC, WGFC, and TWC Borrower, asserting a secured claim of $46,336,790.99 based on the AI International Note and the AI International PSA.  *See* Murphy Decl. Exs. A-D.

5.      MUFG is the administrative agent and letter of credit issuer under a Second Amended and Restated Credit and Security Agreement dated September 30, 2013 among MUFG, TWC Domestic and the lenders referred to therein ("MUFG Pre-Petition Agreement").  TWC Domestic's obligations under the MUFG Pre-Petition Agreement are guaranteed by TWC and secured by a first-priority lien on substantially all of TWC Domestic's assets and a senior pledge of TWC's equity in TWC Domestic.

6.      MUFG is also the administrative and collateral agent under the Debtor-in-Possession Loan and Security Agreement ("DIP Loan Agreement").  Pursuant to the DIP Loan

Agreement, Holdings, TWC, and TWC Domestic may borrow up to $25 million from specified lenders ("DIP Loan").  The DIP Loan is secured by all present and after-acquired property of the Debtors, excluding avoidance actions under Chapter 5 of the Bankruptcy Code, commercial tort claims belonging to the Debtors or their estates, any claims arising out of the conduct of Harvey Weinstein, Robert Weinstein, or their non-debtor affiliates, and any claims against any party for contribution, reimbursement, or indemnification.

7.    UBE is the administrative agent under a Credit and Security Agreement dated October 9, 2015 (as amended), among UBE, TWC Domestic and lenders referred to therein ("UBE Pre-Petition Agreement").  TWC Domestic's obligations are secured by a junior lien on substantially all of TWC Domestic's assets.

8.    Neither MUFG nor UBE filed proofs of claims in these Cases.  The Debtors have amended their schedules to list both MUFG and UBE has having secured claims that are not contingent, unliquidated or disputed.  [D.I. 1463-64].

**B.    DIP Loan**

9.    On March 20, 2018, the Debtors filed a motion for orders approving, among other things, post-petition financing ("DIP Loan Motion").  [D.I. 11].

10.    On March 20, 2018, the Court entered an order granting the DIP Loan Motion on an interim basis and scheduling a final hearing ("Interim DIP Order").  [D.I. 76].

11.    On April 17, 2018, the Court entered the Final DIP Order.  [D.I. 267].

12.    The factual findings requested by MUFG and UBE were set forth in two sections of the Final DIP Order spanning at least fourteen (14) pages.  Among these were findings that the Pre-Petition Agent and UBE held "allowed secured claims."  Final DIP Order ¶¶ E(iii)f, F(iii)f. The Defendants also sought findings on the enforceability and binding effect of the relevant loan and security documentation, the amount of principal and interest owed, and other matters

relevant to the allowance and secured status of Defendants' claims.  Final DIP Order ¶¶ E(i)-(v),

F(i)-(v).

13.    In addition, in the Final DIP Order, the Court ordered:

> **Investigation Rights.**  The Committee shall have until April 27,
> 2018 . . . and all other non-debtor parties-in-interest . . . shall have
> seventy-five (75) days from the Petition Date (each, as applicable,
> the "Investigation Termination Date") to investigate the validity,
> perfection and enforceability of the Pre-Petition Liens and the Pre-
> Petition Obligations as well as the junior liens held by [UBE] . . .
> and to assert any other claims or causes of action against the Pre-
> Petition Secured parties or [UBE].  The Committee or other non-
> debtor party in-interest . . . shall have only until the applicable
> Investigation Termination Date to file such objection or claim . . .
> setting forth the basis of any such challenge, claim or cause of
> action; provided, however, that nothing contained in the DIP Loan
> [d]ocuments or this Final [DIP] Order shall be deemed to confer
> standing on any party-in-interest to commence a challenge.

Final DIP Order ¶ 16.    The 75th day after the Petition Date was June 2, 2018, a Saturday.

Pursuant to Bankruptcy Rule 9006, the Investigation Termination Date was June 4, 2018.

14.    In paragraph 28 of the Final DIP Order, the Court ordered:

> **Sale Proceeds.**  Unless . . . a [c]hallenge is asserted prior to the
> applicable Investigation Termination Date and sustained by the
> Court prior to the closing of any sale of the Pre-Petition Collateral,
> the DIP Secured Parties, the Pre-Petition Secured Parties, and the
> UBE Secured Parties shall, subject to satisfaction of Permitted
> Priority Liens from and to the extent of the proceeds of collateral
> securing such Permitted Priority Liens, be paid in cash upon the
> closing of a sale of Pre-Petition Collateral, *subject to disgorgement*
> *to the extent any [c]hallenge asserted in accordance with the terms*
> *of this Final [DIP] Order is ultimately sustained by the Court*.

Final DIP Order ¶ 28 (emphasis added).

**Lantern Sale**

15.    On March 20, 2018, the Debtors filed a motion to approve bidding procedures for

the sale of substantially all of their assets, to schedule an auction, and to ultimately approve the

sale of substantially all of their assets ("Sale Motion").  [D.I. 8].  The Debtors sought approval of

an asset purchase agreement with Lantern ("Lantern APA" or "APA") attached to the Sale

Motion, subject to higher and better offers.  Under the Lantern APA, Lantern would purchase

substantially all of the Debtors' assets for $310 million, subject to certain adjustments, payment

of certain cure amounts, and assumption of certain liabilities.  Section 2.7 of the Lantern APA

provides:

> Aggregate Purchase Price.  . . . Each of Buyer and each Seller
> Party hereby acknowledges and agrees that the Cash Purchase
> Price shall be allocated such that (i) the value of the Purchased
> Assets that comprise the TWC Domestic Collateral is greater than
> the sum of (v) the TEC Domestic Debt (in the amount, as of the
> date hereof, of approximately $175 million . . ., plus (w) the
> principal amount outstanding under the DIP [Loan] Agreement . . .
> provided that such principal amount, for purposes of this Section . .
> . shall not be in excess of $26 million, plus (x) all Guild Residuals
> secured by the TWC Domestic Collateral and accrued prior to the
> Petition Date (in the amount, as of the date hereof, of
> approximately $8 million), plus (y) the amount of all interest
> accrued and unpaid after the Petition Date through the Closing
> Date on the amount described in the preceding clauses (i)(v)
> through (i)(x), minus (z) any principal payments on the amounts
> described in the preceding clauses (i)(v) through (i)(x) after the
> Petition Date and through the Closing Date.

16.    On April 6, 2018, the Court entered an order approving the Debtors' proposed

bidding procedures and scheduling an auction on May 4, 2018.  [D.I. 190].

17.    On April 30, 2018, AI International filed its limited objection to the Sale Motion.

[D.I. 582].

18.    On May 1, 2018, the Debtors filed a notice stating that the auction had been

cancelled and designating Lantern as the successful bidder.  [D.I. 653].

19.    On May 9, 2018, the Court entered the Sale Order granting the Sale Motion and

approving the Sale.  [D.I. 846].  In paragraph 62 of the Sale Order, the Court ordered: "**[t]he**

**allocation of Cash Purchase Price set forth in section 2.7 of the [Lantern] APA shall not be**

**binding on any party in interest other than as between the Debtors and the Purchasers and**

**shall not bind the Court in determining the allocation of the remaining proceeds of the Sale**

**Transaction.”**  *See* Neiburg Decl. Ex. 5 (Sale Order) (emphasis added).

20.     On June 2, 2018, AI International filed the Complaint commencing a Challenge under the terms of the Final DIP Order. (Adv. Pro. D.I. 1).

21.     On July 11, 2018, the Court entered an order approving an amendment to the APA (“APA Amendment”). [D.I. 1220].  Among other things, the APA Amendment reduced the Purchase Price from $310 million to $289 million prior to any adjustments.   The APA Amendment did not include any revisions to section 2.7 of the APA.

22.     The Sale closed on July 13, 2018 (“Closing Date”). [D.I. 1247]. AI International has been informed that the Purchase Price was reduced by over $80 million under the terms of the APA.

## V.     ARGUMENT

### A.     Summary Judgment Standard

23.     Federal Rule of Civil Procedure 56 provides that “[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.”  Fed. R. Civ. P. 56(a) (made applicable by Federal Rule of Bankruptcy Procedure 7056); *In re Aerogroup Int’l Inc.*, No. 17-11962 (KJC), 2018 WL 3155250, at *2 (Bankr. D. Del. June 25, 2018).  “Material facts are those ‘that could affect the outcome’ of the proceeding, and ‘a dispute about a material fact is ‘genuine’ if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.’” *Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2018 WL 4109231, at *2 (D. Del. Aug. 28, 2018) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (“Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment."). A dispute over a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

24.     "The moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *IFM Therapeutics, Inc. v. Lycera Corp.*, No. CV 17-608-LPS, 2018 WL 4223192, at *3 (D. Del. Aug. 31, 2018); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *Aerogroup*, 2018 WL 3155250, at *2. When determining a motion for summary judgment, the court must construe all evidence in the light most favorable to the nonmoving party. *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962); *Newhall Land Farming Co. v. Am. Heritage Landscape, LP (In re LandSource Comtys. Dev. LLC)*, 476 B.R. 454, 459 (Bankr. D. Del. 2012). Further, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

25.     As will be more fully set forth below, the arguments raised by Defendants in the Summary Judgment Motion are based on errors of law, erroneous interpretations of orders of the Court, or on matters where there is a genuine issue of material fact.

**B.     AI International's Complaint Properly Asserts Challenges Within the Scope of the Final DIP Order**

26.     Defendants make the specious claim that AI International's Complaint failed to assert a Challenge under the Final DIP Order and is thus barred by the doctrine of *res judicata*. However, Defendants argument is grounded in a flawed interpretation of the Final DIP Order that asks the Court to ignore its plain language and read in terms and conditions that are not

found in its text.  In fact, AI International complied with paragraph 16 of the Final DIP Order precisely as written, and Defendants' *res judicata* argument should be rejected.

> ### 1.  AI Had Standing to Bring Its Challenges Without Leave of Court

27.  The Defendants argue extensively that AI International's Challenges assert estate causes of action, requiring AI International to seek derivative standing to file the Complaint. This argument has no merit and ignores the obvious:  *any creditor or party-in-interest* may seek a determination of the secured status of a claim or object to the allowance of claims under the Bankruptcy Code and applicable legal authority.

> #### i.  AI International Has Standing to Object to Union Bank's Secured Status Under Section 506 of the Bankruptcy Code

28.  Counts I and II of the Complaint seek, among other things, a determination under section 506 of the extent to which the liens claimed by MUFG and UBE in the assets of TWC Domestic, which were included in the Sale, if any, were valid, perfected and enforceable with respect to such assets.  As part of this relief, AI International seeks a valuation of the film library assets of TWC Domestic, purportedly pledged in favor of MUFG and UBE, to determine the secured status of Defendants' claims, and therefore the extent of its entitlement to retain proceeds from the Sale.  Furthermore, to the extent any of the Challenges set forth in the Complaint are successful, Counts V and VI seek disgorgement of any Sale proceeds that exceed Defendants' allowed secured claims.

29.  Bankruptcy Courts have consistently held that any party in interest can seek relief under section 506 of the Bankruptcy Code.  For instance, in *Gaglia v. First Federal Savings & Loan Association*, the Third Circuit held that an individual Chapter 7 debtor was a party-in-interest that could challenge a lien under sections 506(a) and (d), without the participation of the

Chapter 7 trustee.  889 F.2d 1304, 1309 (3d Cir. 1989) *abrogated on other grounds by Dewsnup v. Timm*, 502 U.S. 410 (1992).   Similarly, the bankruptcy court for the Southern District of Florida squarely held that a creditor has standing to bring a claim under section 506(a) in *In re Barrios*, 257 B.R. 626 (Bankr. S.D. Fla. 2000).   In that case, an unsecured creditor brought an objection seeking to strip the lien of a secured creditor on the basis that its claim exceed the value of its share of the collateral.  *Id.* at 626.   The debtor countered by arguing that the creditor lacked standing to seek modification of another creditor's lien under section 506(a).  *Id.*   The court disagreed, and ordered the debtor to modify the secured creditors lien and the plan pursuant to section 506(a).  *Id.* at 628.   The court relied on the Third Circuit case *Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.)*, 799 F.2d 91 (3d Cir. 1986), and held that a general creditor had standing to force the modification of another creditor's lien under section 506(a).  *Id.* ("As there is no language contained in § 506(a) that restricts a party from taking action under it . . . a general unsecured creditor, has standing to seek modification of the claim of . . . another creditor, pursuant to § 506(a)").  *Id.*

30.   Accordingly, AI International has independent, direct standing to seek a determination of the secured status of Defendant's claims according to a valuation of Defendants collateral.  The right to bring a Challenge under 506(a) ensures that a senior secured creditor is given priority of payment only up to the actual value of its interests in collateral, thus providing a larger share, and better return, to other creditors.  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) (holding section 506(a) "calls for the division of secured creditors' claims into 'secured and unsecured portions, with the secured portion[s] of the claim[s] limited to the value of the collateral.'") (quoting *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 961 (1997)); 4 COLLIER'S ON BANKRUPTCY, ¶ 506.03 (16th ed., 2018) ("[I]f the value of the collateral is less

than secured creditor's claim, the secured creditor does not receive any special protection for the amount of the unsecured portion of the claim.").

31.     Individual secured creditors must have standing to pursue such Challenges, as it is often the case that a debtor-in-possession will not be inclined to upset its senior creditors (who—like here—often provide DIP financing) and a creditors' committee may not be incentivized to pursue such an action where—like here—any potential returns to the pool of general unsecured creditors would be likely be insignificant.  *Cf. McKeesport*, 799 F.2d at 94 (holding creditor had standing to bring challenge normally reserved for trustee under section 506(c) where debtor and creditors' committee were not incentivized to pursue the challenge).

32.     Bankruptcy Courts face the vital issues surrounding the valuation of collateral with frequency.  There is a well-developed body of precedent to make the determinations of value called for under Bankruptcy Code section 506(a).  Here, the need to value Defendants' collateral, and the other businesses and assets sold to Lantern, is critical in a second respect.  The Sale included a wide array of assets sold by multiple Debtors.  These included operating television and film production businesses, and "libraries" of domestic and international film rights.  Yet, Defendants take the novel (and self-serving) approach that none of this matters.  To them, the value of their collateral was exactly equal to the face amount of their claim—whatever they assert that claim to be.[4]  This contradicts everything that is known about the intensive, fact-driven inquiry required to value collateral in bankruptcy cases.

> **ii.     AI International Has Standing to Object to Defendants' Claim Under Section 502 of the Bankruptcy Code**

---

[4]  AI International is informed that Defendant MUFG insisted on being paid millions more than the principal and accrued interest on its claim on the Closing Date.  This excess payment was apparently demanded to fund its efforts to defeat AI International's Challenges and avoid having to prove up its alleged fully secured claim.

33.     AI International has standing to object to Defendants' claims under section 502 of the Bankruptcy Code.  It is black letter law that in a Chapter 11 case any creditor has standing to object to another creditor's claim.  *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects."); 11 U.S.C. § 1109(b) (listing among parties in interest:  "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee"); *Adair v. Sherman*, 230 F.3d 890, 894 n.3 (7th Cir. 2000) ("Parties in interest include not only the debtor, but anyone who has a legally protected interest that could be affected by a bankruptcy proceeding.  Therefore, if one creditor files a potentially fraudulent proof of claim, other creditors have standing to object to the proof of claim.") (internal citation omitted); *In re Williamson*, 43 B.R. 813, 820 (Bankr. D. Utah 1984) ("'There is no doubt that the phrase 'parties in interest' applies to those who … have some interest in the assets of the debtor being administered in the case.'") (quoting 4 COLLIER'S ON BANKRUPTCY, ¶ 501.01 at 502-12 (15th ed., 2003)); *In re Charter Co.*, 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986) ("Since the law does not impose a duty on the debtor-in-possession to act in the best interest of all general creditors, the Court will not disregard the plain language of § 502(a) and limit the right of general creditors to object to the allowance of a proof of claim in a chapter 11 proceeding.").

34.     It is particularly appropriate that AI International move forward with its section 502 objection given the Defendants' continued refusal to file proofs of their alleged secured claims.  It may have been their expectation that the Challenge period would pass and they could rest on the proposed findings in the Final DIP Order.  In any case, AI International fully expected, once the Complaint was filed, Defendants would file their proofs of claim—and the supporting

documentation required under Bankruptcy Rule 3001.  Instead, Defendants now argue that there is no need to file proofs of claim—and indeed, that their clams are not subject to objection—because the Debtors amended their schedules to list the Defendants' claims as liquidated and not contingent.  MSJ at 6 n.11.

35.     Regardless of whether or not the Defendants filed proofs of claim, AI International has standing to object.  *See In re 3333 Main, LLC*, No. 13-51533, 2014 WL 2338273, at *5 (Bankr. D. Conn. May 29, 2014) ("The 'deemed filed' language of § 1111(a) does not eliminate the objection mechanism in the claims allowance process . . . .  Indeed, but for the inter-relationship between §§ 1111(a), 501, and 502(a), a chapter 11 debtor plan proponent could create an impaired class of creditors populated with creditors scheduled as holding undisputed claims, to which no party in interest could object under § 502(a) unless actual proofs of claim were filed.  Those Code sections eliminate that potential manipulation of the confirmation process.");[5] *Hartford Holdings, LLC v. Mladen (In re Eternal Enter., Inc.)*, 558 B.R. 47, 54 (Bankr. D. Conn. 2016) (granting party-in-interest's objection to a "deemed filed" claim under § 1111(a)).

### iii.     AI International's Challenges Do Not Assert Claims of the Estate

36.     Defendants' other attempt to argue that AI International was required to obtain derivative standing says the Complaint contains "general cause[s] of action that belongs to the estate."  MSJ ¶ 55.  This completely mischaracterizes AI International's Challenges.  It is clear on the face of the Complaint that none of the Counts asserts claims for avoidance or other causes

---

[5]  Section 1111(a) states that "A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521(a)(1) or 1106(a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated."  11 U.S.C. § 1111(a).

of action of the estate.  Counts I, II, V, and VI assert Challenges based on AI International's right

to seek a determination of the secured status of Defendants' claims, and disallowance of

Defendants' claims, which AI International is asserting in its own right, not on behalf of the

estate.[6]  None of the cases relied upon by Defendants hold otherwise or even address the setting

where a creditor is seeking relief under sections 506(a) and 502.[7]  Nor do counts V and VI

implicate causes of action of the estate.  Under paragraph 16 of the Final DIP Order, the remedy

of disgorgement is available to the extent *any* Challenge is successful, regardless of who brings it.

>    **2.      The Final DIP Order Does Not Require a Party to Complete an Investigation Before Making a Challenge**

37.      Without a shred of support in the language of Paragraph 16 the Final DIP Order,

Defendant's seek to erect yet another artificial obstacle to the exercise of AI International's right

to bring a Challenge.    Paragraph 16 provided an opportunity for a parties-in-interest to

investigate prior to lodging a Challenge.  Nowhere in paragraph 16 is there any requirement to

do so.  Parties-in-interest are entitled to bring a Challenge by commencing an appropriate action

---

[6]  Defendants argue that the Complaint fails to demonstrate how its alleged injury differs from any other creditor in the Debtors' Chapter 11 Cases who stand to benefit from a decreased allocation to TWC Domestic.  MSJ ¶ 56).  This statement is based on a false premise.  Neither the Bankruptcy Code nor any other legal authority arising out of chapter 11 debtor-in-possession cases require a plaintiff seeking disallowance of and determination of the secured status of claims under Bankruptcy Code sections 502 and 506 show a special distinct injury.

[7]  The cases cited by Defendants are inapplicable because none of those cases involved objections by a creditor under sections 502 or 506(a).  *See In re Emoral, Inc.,* 740 F.3d 875, 881 (3rd Cir. 2014) (cause of action based on successor liability); *In re DSI Renal Holdings, Inc.*, 574 B.R. 446, 479 (Bankr. D. Del. 2017) (veil piercing claim brought on behalf of all creditors); *Official Comm. of Equity Security Holders v. Adelphia Commc'n Corp. (In re Adelphia Commc'n Corp.)*, 371 B.R. 660, 671 (S.D.N.Y. 2007) (claims for RICO violations, breach of contract, fraud and fraudulent concealment brought on behalf of the Debtor); *In re Exide Techs.*, 303 B.R. 48, 54 (Bankr. D. Del. 2003) (claims for preference payments, fraudulent transfers, and aiding an abetting breach of fiduciary duty); *In re Tenn. Valley Steel Corp.*, 183 B.R. 795 (Bankr. E.D. Tenn. 1995) (claim of equitable subordination); *In re Centaur, LLC*, No. 10-10799 KJC, 2010 WL 4624910, at *1 (Bankr. D. Del. Nov. 5, 2010) (claims for fraudulent transfer, avoidance, and a declaration excluding certain assets from secured creditors' collateral.  Moreover, the court in *Centaur* never made an affirmative ruling that every claim brought by the creditors committee was a derivative claim.  2010 WL 4624910 at *7.

prior to the deadline.  Final DIP Order ¶ 16 ("[A]ll other non-debtor parties-in-interest . . . shall

have seventy-five (75) days from the Petition Date . . . to assert any other claims or causes of

action against the Pre-Petition Secured Parties or the UBE Secured Parties.").   Here, AI

International has challenged the allowed secured status of Defendants' claims by seeking a

determination of the value of its collateral.  It would be impractical to require that the detailed

financial analysis and valuation of the debtors' film rights collateral be completed before the

deadline to file its challenge.

### 3.        The Complaint Was Timely Filed

38.     Finally, the Final DIP Order requires that any Challenge be filed by June 4, 2018.

It is undisputed that AI International timely filed its Complaint prior to that date.

### C.       *Res Judicata* Is Not Applicable When AI International Had Standing to Bring its Challenges

39.     Because AI International has properly brought Challenges pursuant to the Final

DIP Order, the doctrine of *res judicata* is wholly inapplicable to bar AI International's

Complaint, and Defendants' argument that the Complaint contains "collateral attacks…on Final

DIP financing orders" (MSJ at 58), falls flat.[8]

40.     Defendants rely on *In re SAI Holdings Ltd.*, No. 06-33227, 2012 WL 3201893

(Bankr. N.D. Ohio Aug. 3, 2012), and *In re 11 E. 36th LLC*, No. 13-11506(JLG), 2016 WL

---

[8]  Defendants make much of the fact that AI International did not file an objection or appeal when the Final DIP Order and Sale Order were submitted and approved.  MSJ at 28 ("The Plaintiff could have objected to entry of the Interim DIP Order, which included similar stipulations and acknowledgements to those in the Final DIP Order.  The Plaintiff could have objected to the entry of the Final DIP Order and the process set forth therein for asserting a Challenge.  The Plaintiff could have appealed the entry of the Final DIP Order before it became final and non-appealable.  The Plaintiff could have voiced its concerns on the record at any of the eight (8) hearings it attended and participated in through the entry of the APA Amendment Order. It did ***none*** of those things.").  These arguments miss the point.  There were no requirements in the Final DIP Order requiring AI International to do anything other than what it did, namely file a timely Challenge.  Defendants cannot point to any section of the Interim DIP Order or Final DIP Order requiring their suggested alternatives to filing the Complaint because none exist.

152924 (Bankr. S.D.N.Y. Jan. 12, 2016) for the proposition that *res judicata* should bar AI International's claims.  But these cases are simply inapplicable.

41.     In *SAI Holdings* the court entered a supplemental DIP order that retroactively approved loans made by the DIP lender after the DIP line of credit was terminated pursuant to a "Termination Event" under the Final DIP order when a large customer of the debtor left for a competitor.  2012 WL 3201893 at *2.  Well after the entry of the supplemental DIP order, and after the liquidating agent began liquidating the estates, a creditor filed a motion to compel disgorgement on the basis that the supplemental DIP order did not retroactively approve of certain loans made after the Termination Event, but prior to the entry of the supplemental DIP order.  *Id.* at *5.  The court found that the supplemental DIP order *did* retroactively authorize the loans and that the plaintiff's challenge to the terms of the supplemental DIP order were barred by *res judicata*.  *Id.* at *5-*7.

42.     *SAI Holdings* is useless to the Defendants, because the supplemental DIP order did not provide for a challenge period.  In the absence of a challenge period, the doctrine of *res judicata* applied once the order was entered and the appeal period concluded.  In contrast, the Final DIP Order specifically reserved for parties-in-interest the right to conduct an investigation and/or bring a Challenge to any of the Order's findings.  And while AI International does not dispute that the Final DIP Order is a final, binding order, that fact is simply irrelevant, as AI International timely filed a proper Challenge within the Challenge period explicitly contemplated in that Order.

43.     Similarly, Defendants rely on *11 E. 36th LLC* in arguing that the exculpation provision contained in Paragraph 16 of the Final DIP Order bars the claims in AI International's Complaint.  *See* MSJ ¶ 63.  In *11 E. 36th* LLC, the bankruptcy court entered a DIP financing

21

order that exculpated the DIP lender from "'any liability for any claims' related to the Debtors' restructuring efforts."  2016 WL 152924, at *9.  The court found that this provision barred the claims in a third party complaint filed against the DIP lender.  The Defendants here attempt to draw an analogy to the exculpation provision contained in paragraph 16 of the Final DIP Order, which they argue "released, waived, and discharged each of the Pre-Petition Secured Parties . . . and the UBE Secured Parties . . . from any and all claims and causes of action arising out of, based upon, or elated to, in whole or in part, the Pre-Petition Obligations, the UBE Obligations, or their respective prepetition relationship with such Debtor . . . including, without limitation, any claims or defenses as to the extent, validity, priority, or enforceability of the Pre-Petition Liens or the Pre-Petition Obligations."  Final DIP Order ¶ 16.  Defendants conveniently fail to mention that the exculpation provision in paragraph 16 is only effective "[i]f a Challenge is not filed on or before the Investigation Termination Date."[9]  Because AI International timely filed a valid Challenge prior to the Investigation Termination Date, the exculpation provisions are inoperative.  By the terms of the Final DIP Order, the exculpation language in paragraph 16 cannot serve to bar AI International's Challenge.

44.    *Winget v. JP Morgan Chase Bank. N.A.*, 537 F.3d 565, 580 (6th Cir. 2008), is cited by Defendant for the proposition that *res judicata* barred the claims of a guarantor of the debtor against a lender brought after the sale of the debtors' assets because their claims "attacked the heart of the value of the assets" and should have been brought before the bankruptcy court issued the sale order.  *Id.* at 580.  But the plaintiffs in that case sought to directly challenge a

---

[9]  Defendants also rely on *SAI Holdings Ltd.*, 2012 WL 3201893, at *7, as that court held in the alternative that the creditor was estopped from bringing its motion to compel disgorgement by a exculpation provision similar to that at issue in *11 E. 36th LLC*.  For the reasons stated above, *SAI Holdings* is equally inapplicable on this point.

final sale order by bringing claims specifically barred under that order.  Moreover, the plaintiffs' challenge was untimely, having been filed long after the objection and appeal deadlines had passed.  Here, AI International is not seeking to bring claims barred by the Sale Order or Final DIP Order—quite the opposite.   AI International is bringing a Challenge and seeking disgorgement pursuant to the Challenge and disgorgement provisions of the Final DIP Order that allow it to do so, and is doing so within the specified timeframe.

45.       Defendants cite to *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank N.A.,* 816 F.3d 273, 279-80 (4th Cir. 2016) for the unremarkable proposition that a debtor's challenges to the propriety of certain loan transactions, made more than one year after the chapter 11 case was dismissed, were barred by the doctrine of *res judicata* when the sale order had already established the validity of the lenders' loan transactions with the debtor.  *Id.* at 279.  *Providence* similarly has no significance here because the debtor's challenge was clearly untimely, having been brought well after the applicable objection and appeal periods.  Here, no party disputes that AI International timely filed the Complaint.  Further, unlike *Providence*, the Sale Order does not establish the validity or extent or Defendant's liens.  Those issues are covered by the Final DIP Order, which explicitly contemplates AI International's Challenge.[10]

---

[10]   The remainder of Defendants' cases are similarly inapplicable as they all involved untimely objections brought after the challenge or objection period ended.  *See Spartan Mills v. Bank of Am. Ill.*, 112 F.3d 1251, 1256 (4th Cir. 1997) (untimely challenge to final orders that granted Bank of America a first priority lien, ratified sale of the collateral, and ordered all proceeds be paid to Bank of America); *In re Brooks Sand & Gravel, LLC*, 361 B.R. 477, 479 (Bankr. W.D. Ky. 2007) (untimely challenge to liens specifically barred by final financing order); *In re Patriot Contracting Corp.*, No. 05-33190 DHS, 2006 WL 4452840, at *3 (Bankr. D.N.J. Mar. 28, 2006) (untimely challenge to order granting Debtor's use of cash collateral); *In re Target Indus., Inc.*, 328 B.R. 99, 115 (Bankr. D.N.J. 2005) (untimely claims by Debtor's successor that were released in confirmation order and other orders).

**D.**    **Neither the Sale Order nor the APA Precludes AI International from Bringing Challenges and Seeking Disgorgement Pursuant to the Final DIP Order**

46.    The Final DIP Order unambiguously allows for Challenges to Defendants' liens and claims notwithstanding any provision of the Sale Order.    Any proceeds paid to the Defendants that exceed the extent of their liens and claims may be subject to disgorgement after a successful challenge pursuant to Paragraph 28 of the Final DIP Order.    Contrary to what Defendants would have this Court believe, the Sale Order includes no language whatsoever restricting or modifying either paragraph 16 or 28 of the Final DIP Order.    In fact, those specific Challenge rights are incorporated into the Sale Order through Paragraphs 8 and 62.

Paragraph 8 of the Sale Order provides:

> . . . notwithstanding the foregoing, any amounts paid to the Pre-Petition Agent and, as applicable, distributed to the Pre-Petition Lenders pursuant to the terms of this Order and the Final DIP Order, **shall be subject to disgorgement to the extent any Challenge asserted in accordance with the terms of the Final DIP Order is ultimately sustained by the Court** . . . .

Sale Order ¶ 8 (emphasis added).    In addition, paragraph 62 of the Sale Order contains limiting language incorporating the terms of the Final DIP order and restricting the allocation provisions of the APA to only bind the parties to the APA by stating:

> …. *except as expressly set forth in section 2.7(i) of the APA, the Final DIP Order or this Order*, the allocation of the Cash Purchase Price set forth in section 2.7 of the APA is not binding on any party in interest other than as between Debtors and the Purchaser and shall not bind the Court in determining the allocation of the remaining proceeds of the Sale Transaction

Sale Order ¶ 62 (emphasis added).

47.    Defendants' claim that these two provisions required AI International to object to the payment of Sale proceeds to the Defendants and, if the objection were overruled, appeal the Sale Order.    This makes no sense whatsoever.    AI International had no objection to the payment

24

of Sale proceeds to the Defendants—*because the payment had been made subject to disgorgement by a final order of this Court.*  The Final DIP Order could not have been clearer that any party who asserts a Challenge under the Final DIP Order cannot and should not be bound by section 2.7 of the APA or the payment provisions of paragraph 8 of the Sale Order.

48.    It is high irony that Defendants devote so much time and energy to arguments over the finality and binding effect of the Sale Order and the Final DIP Order, when their terms show AI International has every right to pursue the relief sought in the Complaint.  The terms of bankruptcy court orders are given meaning under the principles of contract interpretation.  *In re Trico Marine Servs., Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011) ("[W]hen construing an agreed or negotiated form of order, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."); *see also Rifken v. CapitalSource Fin., LLC (In re Felt Mfg. Co., Inc)*, 402 B.R. 502, 511 (Bankr. D.N.H. 2009) ("The terms of court orders, plans of reorganizations, and stipulations between the parties are typically examined under principles of contract interpretation.").  Confirmed chapter 11 plans are also construed as contracts under the governing state's law.  *Solus Alt. Asset Mgmt. LP v. Delphi Auto. PLC (In re DPH Holdings Corp.)*, 553 B.R. 20, 25 (Bankr. S.D.N.Y. 2016) (applying contract interpretation principles to confirmed plans and associated documents) (citing *In re Dynegy Inc.,* 486 B.R. 585, 590 (Bankr. S.D.N.Y. 2013)); *Am. LaFrance v. RT Jedburg Commerce Park, LLC (In re Am. LaFrance, LLC)*, 461 B.R. 267, 271 (Bankr. D. Del. 2011) ("With respect to their enforcement, agreed orders are generally treated as contracts."); *Enter. Energy Corp. v. U.S. (In re Columbia Gas Sys., Inc.)*, 146 B.R. 106, 113 (D. Del. 1992), *aff'd sub nom. In re Columbia Gas Sys. Inc.,* 50 F.3d 233 (3d Cir. 1995) ("For bankruptcy purposes, this Court believes it is appropriate to treat the judicially approved settlement agreement in this

case as a contract.").

49.     In *Trico Marine,* Chief Judge Shannon explained that "at bottom, the goal is to determine the rights, duties, and reasonable expectations of the parties, as disclosed to and blessed by the Court." *Trico Marine,* 450 B.R. at 482.  "[T]he paramount goal of contract interpretation is to determine the intent of the parties." *Id. (*quoting *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 587 (3d. Cir. 2009)).  The language in the contract is the strongest manifestation of that intent.  *Id.*  Context is a similarly important consideration when interpreting language in a contract.  *See* Murphy Decl. Ex. F (Bench Ruling on the Committee's Motions to Extend the Challenge Period for an Investigation Pursuant to Bankruptcy Rule 2004*, In re Outer Harbor Terminal, LLC*, Case. No. 16-10283 (LSS) [D.I. 690] (Bankr. D. Del. May 5, 2017) (the "Outer Harbor Bench Ruling")); *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) ("[I]n analyzing contractual text, a court need not turn a blind eye to context.").  An order should be construed as a whole and no one paragraph should be considered in isolation.  *Trico Marine*, 450 B.R. at 483.[11]

50.     Further, the Final DIP Order, Sale Order and Section 2.7 of the APA must be interpreted together.  *Lefkowitz v. Michigan Trucking, LLC (In re Gainey Corp.)*, 447 B.R. 807, 818 (Bankr. W.D. Mich. 2011), *aff'd*, 481 B.R. 264 (B.A.P. 6th Cir. 2012) ("In this case, the Confirmation Order, the Plan, the Sale Order, the APA, and the Schedules to the APA are all intertwined.  When there exist multiple documents or writings tied together, all writings must be

---

[11]   In addition, whether under New York law or Delaware law, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]'" *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (citations omitted); *see also In re DPH Holdings Corp.*, 553 B.R. 20, 26 n.7 (Bankr. S.D.N.Y. 2016) ("[F]or contract interpretation purposes there is no meaningful difference between Delaware and New York law.")

considered and interpreted as a single package."); *Edelman Arts, Inc. v. Art Int'l (UK) Ltd.*, 841 F. Supp. 2d 810, 823 (S.D.N.Y. 2012) (applying New York law) ("[A]ll writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together.").

51.    The Defendants' arguments contradict these basic rules of interpretation.  The Sale Order did not include any determination that Defendants have allowed secured claims.  Nor did the Sale Order eliminate AI International's right to bring a Challenge under the Final DIP Order.  The Sale Order similarly did not negate MUFG and UBE's obligation to disgorge any Sale proceeds they received at the closing, to the extent AI International's Challenges are successful.  The Challenge provisions of the Final DIP Order would be meaningless if a party-in-interest had to make those identical arguments in connection with the Sale Order or the APA. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 706 (S.D.N.Y. 2012) ("A contract interpretation 'that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.'") (citing *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A 5571-CS, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012) ("[A] court will prefer an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage.").

52.    *Trico Marine* is instructive.  In that case, the court entered a sale order approving the sale of certain vessels on the condition that the proceeds were used to pay off a debt owed to certain secured noteholders.  450 B.R. at 477.  During the negotiation process and prior to the entry of the sale order, the debtor, guarantor, and indenture trustee disagreed as to the status of the indenture's make-whole provision.  *Id.* at 478.  The indenture trustee argued that it was entitled to an additional sum pursuant to the make-whole, which sum, it argued, was secured.  *Id.*

The debtors and guarantor did not dispute the amount the indenture trustee was owed under the make-whole, but challenged validity and priority of that claim. *Id.* The parties were at an impasse but decided to go forward with the sale, despite the fact that the debtors lacked sufficient time to investigate the validity and priority of the make-whole claim prior to the sale hearing. *Id.* Thus, the final sale order carved out the issue and provided a mechanism for further negotiations between the parties and, should those negotiations fail, final adjudication regarding the status of the make-whole claim before the court. *Id.* Ultimately the parties were unable to reach a resolution and the matter was submitted to the court. *Id.*

53.    In arriving at its decision, the court (1) adhered to the sale order's reservation regarding the adjudication of the make-whole and (2) determined that the make-whole claim was not secured by looking at the entire agreement. *Id.* at 482-84. The court found that paragraph 7 of the sale order, which required that "any and all valid and enforceable liens, claims, or encumbrances on, against or in the Vessels . . . shall be transferred, affixed, and attached to the proceeds of the Sale . . . with the same validity, priority, force and effect such liens, claims, or encumbrances had on the Vessels immediately prior to the Sale" barred the attachment of sale proceeds to satisfy the make-whole as it would create a "new senior lien" in violation of paragraph 7. *Id.* at 483. This is instructive here because the Final DIP Order similarly contained an express reservation for the final determination of the relevant findings. Moreover, the Court adopted the interpretation that ensured all provisions were read in harmony.

54.    In *Outer Harbor*, the court applied contract interpretation principles to ensure that no provision of a final financing order was rendered meaningless. *See* Murphy Decl. Ex. F (Outer Harbor Bench ruling at 10). There, the court entered a final DIP order that set forth an investigation period that ended "**no later than the earlier of** (i) sixty (60) days from the date of

the official committee's formation for any appointed official committee or (ii) seventy-five (75) days from the date of entry of the Interim Financing Order for all parties other than an official committee . . . ."  *Id.* at 9 (emphasis in original).  The official creditors' committee was not appointed until well after the seventy-five-day period ended.  *Id.* at 4.  Once appointed, the creditors' committee sought a ruling that the "seventy-five-day period expressly excludes the official committee and so the seventy-five-day period cannot in any way be used to cut off a committee's sixty-day period to investigate."  *Id.* at 9.  The court held otherwise, ruling that "[t]he Committee's interpretation gives no meaning to the words—or the concept of—'the earlier of.'"  *Id.* at 10.  Like the court in *Trico Marine*, the court in *Outer Harbor* applied contract interpretation principles to its prior DIP order, and ensured that the interpretation it adopted gave full effect to all provisions contained therein.

55.    Finally, in *Gainey*, the bankruptcy court read its prior orders together, and adopted an interpretation of those orders that ensured none of them were inconsistent with each other.  447 B.R. 807.  In that case, the debtor sold substantially all of its assets to a purchaser pursuant to a sale order and asset purchasing agreement.  *Id.* at 809-10.  The sale order exculpated the purchaser from all of the debtors' pre-sale liabilities and obligations, but also sold to the purchaser "collateral that was previously given by the Debtors to certain insurance companies which collateral could be drawn down to satisfy, or partially satisfy, the Debtors' obligations to pay the deductible amounts."  *Id.* at 810.  Further, the purchaser had "undertaken the Debtors' prior obligation 'to administer all claims, including pre-closing claims that are or were covered by insurance, for the benefit of the Debtors' estate, at no expense to the estate.'"  *Id.*  Because of these provisions, there arose a question as to who—between the trustee and the purchaser, was responsible for paying insurance deductible amounts that resulted from the

debtors' pre-confirmation accidents and losses. *Id.* The liquidating trustee filed a complaint in which he called upon the court "to review and interpret its prior final orders relating to the sale of estate property . . . and the effect of confirmation" to determine whether the purchaser was "required to pay obligations for tort (such as accident and cargo damage) claims that occurred prior to the sale closing but were not first asserted by the tort claimants until after entry of the Sale Order." *Id.* at 809, 811. The court looked at the confirmation order, the plan, the sale order and the asset purchase agreement together and found that it had "no difficulty in interpreting the combined language in the governing court orders as mandating that [the purchaser was] *not* liable for claims or obligated to pay any related debts for any and all tort claims . . . that arose from occurrences (or omissions) prior to . . . the closing of the sale." *Id.* at 819 (emphasis in original). The court refused to entertain the trustee's alternate interpretation, which it described as an attempt to "jumble the language of the various interrelated writings and invite[] the court to make things more complicated than they actually are." *Id.*

E.    **The Court Should Resolve Any Ambiguity in the Sale Order in a Way that Preserves the Challenge Remedy Under the Final DIP Order**

56.    The purpose of the Sale Order was to approve the terms of the APA and set forth the terms of the Sale and the parameters of closing. In the sale context the natural meaning of the term "allocation" was the disposition of the Sale proceeds on the Closing Date. Defendants appear to interpret the term "allocation" in the Sale Order to mean a final determination of the allowance and secured status of their claims in a very different way, beyond the context of the Sale Order. At best, this posits that the term "allocation" is ambiguous, and connotes some kind of indirect determination of the allowed secured status of their claims and an implicit valuation of the collateral securing their claims. Any apparent ambiguity in the use of the term "allocation" is readily resolved, and not in Defendants' favor.

57.     When a term is subject to two meanings, the Court should use the meaning that harmonizes the Final DIP Order and Sale Order and avoids surplusage.  *See* Outer Harbor Bench Ruling at 10; *Trico Marine*, 450 B.R. at 483; *Gainey*, 447 B.R. at 818; *GRT, Inc.*, 2012 WL 2356489, at *4.  Similarly, like the courts in *Trico Marine*, *Outer Harbor*, and *Gainey*, this Court should not adopt an interpretation of the Sale Order that would render the Challenge and disgorgement provisions in the Final DIP Order meaningless.

58.     Adopting the Defendants view of the meaning of "allocation" would create an inconsistency with the Final DIP Order.  The Final DIP Order, unlike the Sale Order, includes the Court's findings as to the allowance and secured status of Defendants' claims.  Interpreting the term "allocation" to include implied findings as to the allowance and secured status of Defendants' claims renders the Challenge and disgorgement provisions of the Final DIP Order meaningless.   The Court should avoid this result.  *Gainey*, 447 B.R at 818 ("When there exist multiple documents or writings tied together, all writings must be considered and interpreted as a single package.").  Instead, this Court must give those provisions their full effect and allow AI International to avail itself of the ability to challenge the findings in the Final DIP Order granting the Defendants allowed secured claims.

**F.      The Doctrine of *Res Judicata* With Respect to the Sale Order Does Not Bar AI International's Complaint**

59.     Similar to their flawed arguments in connection with the Final DIP Order, Defendants argue that "*res judicata* bars any claims that a party could or should have raised before entry of a sale order."  MSJ ¶ 45.  Here again, their reliance on *Winget* and *Providence Hall* is misplaced, as the Sale Order clearly does not bar timely Challenges.  *See supra* ¶¶ 44-45.

60.     The Defendants would have this court believe that because AI International refused to expand the payments to be made at the closing and participated in the negotiation of

the language of the Sale Order sustaining its claims, it somehow acquiesced in the final allowance of Defendants' claims as fully secured.  The Court should decline the invitation to take such a leap.  Defendants did not request a finding as to the allowed secured status of their claims at the Sale Hearing.  They requested that the Debtor be authorized to pay them an allocated portion of the Sale proceeds.  There was therefore no reason for AI International to object to the determination of the secured status of Defendants' claims, nor any finding from which to appeal.

61.    The plain language of the Final DIP Order taken together with the pertinent provisions of the Sale Order clearly establish otherwise—namely that the Sale Order did not terminate AI International's Challenge rights.  Once the Complaint was properly and timely filed, AI International could pursue its Challenges and, to the extent they are successful, seek disgorgement of the Sale proceeds paid to Defendants on the Closing Date.  *Res Judicata* does not apply to bar AI International's Challenge and the Summary Judgment Motion should be denied.

G.    **AI International Satisfies the Standing Requirements of Article III and Section 1109 of the Bankruptcy Code**

62.    Defendants' argument that AI International has no constitutional standing to challenge the nature and extent of a secured creditors lien and the allowance of its claims is entirely without merit.  First, it is undisputed that AI International is a creditor in these cases, and is a "party-in-interest" pursuant to the express language of Section 1109 of the Bankruptcy Code. *See* 11 U.S.C. § 1109 (listing among parties in interest:  "the debtor, the trustee, a creditors' committee, an equity security holders' committee, *a creditor*, an equity security holder, or any indenture trustee") (emphasis added).  AI International was scheduled as a creditor and has filed a proofs of claim against Holdings, TWC, WGFC, and TWC Borrower, asserting a secured claim

in the amount of $46,336,790.99 based on funds that were advanced to the Debtors pre-petition and remained unpaid.  Murphy Decl. Exs. A-D.

63.    Second, the notion that AI International cannot establish it suffered an "actual injury" is incorrect.  Its proofs of claim constitute prima facie evidence of the validity and the amount of the claim.  FED. R. BANKR. P., 3001(f).  Based on the Complaint and the record before the Court, AI International has demonstrated it has an actual injury capable of redress by a favorable decision on the Complaint.  It is axiomatic that AI International, as a creditor of multiple Debtors, has been injured to the extent the Defendants received more than the value of their collateral.  Absent relief in this action, it will lose any opportunity to prove up the extent of this overpayment.

64.    Defendants' "constitutional standing" argument is belied by its own case citations.  It is primarily based on *In re Flintkote Company*, 486 B.R. 99, 110 (Bankr. D. Del. 2012).  The party held to lack standing in *Flintkote* was not asserting a claim objection or seeking to determine the secured status of another creditor's claim, and was not even a creditor.  *Id.* at 114.  In *Flintkote,* the court was contending with a plan confirmation objection, and noted that "to object to the confirmation of a reorganization plan in bankruptcy, a party must, in the first instance, meet the requirement for standing that litigants in all federal cases face under Article III of the *Constitution*." *Id.* at 110 (*citing In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011)) ("*GIT*"); s*ee also* U.S. CONST. art. III.  Neither *Flintkote* nor *GIT* addressed the issue of constitutional standing of a creditor proceeding under sections 502 and 506 of the Bankruptcy Code.

65.    *In re W.R. Grace & Co.*, 475 B.R. 34, 176 (D. Del. 2012), is similarly inapposite.  The claimant in that case, Garlock, was a potential tort co-defendant who was objecting to

confirmation of W.R. Grace's plan of reorganization. *Id.* at 176. Garlock had not filed a proof

of claim, and was objecting on the basis that it should be entitled to contribution from the debtor

should it be held liable in any future tort litigations brought against it (an injury that Garlock

itself admitted was highly unlikely). *Id.* at 178-82. Further, Garlock did not allege a current

right to set-off or contribution. *Id.* at 178. There, the court ruled that "given that Garlock has

failed to establish a likelihood of injury here that is attributable to Grace, it follows that a federal

court ruling will not remedy allegedly aggrieved Garlock." *Id.* at 184.[12]

66.    In drawing their strained analogy to this action, Defendants allege a chain of

seven "contingencies"  that they argue need to come to pass for AI International to recover in

these Cases. MSJ ¶ 70. AI International readily acknowledges that there is more litigation to

come in these Cases. With all due respect to Defendants' critique of its litigation strategy, it is

ready, willing, and able to proceed. The determination of standing, under the case law, is not a

matter of laying odds about a party's ultimate success. It is about whether a party has an injury

"capable of redress." *Schering Corp. v. Food & Drug Admin.*, 51 F.3d 390, 395 (3d Cir. 1995);

*see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("[T]he mere *possibility* of

failure does not eliminate the value" of plaintiff's causes of action and is insufficient to conclude

the plaintiff lacks standing because of want of redressability) (emphasis in original). AI

International plainly has an injury here. It is capable of establishing, through competent

---

[12]    The other cases cited by Defendants here are inapplicable because none of them concern a creditor's standing in a bankruptcy proceeding. *See Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013) (attorneys suing under Foreign Intelligence Surveillance Act); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (environmental groups suing under Endangered Species Act); *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990) (death row inmate seeking to appeal death sentence imposed on different inmate); *Hassan v. City of New York*, 804 F.3d 277, 293 (3d Cir. 2015) (members of religious group suing under First Amendment); *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 365 (3d Cir. 2014) (political groups suing under § 1983); *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (property owners suing under Fifth Amendment); *ACLUNJ v. Twp. of Wall*, 246 F.3d 258, 261 (3d Cir. 2001) (taxpayers suing under Establishment Clause).

evidence, including expert testimony and analysis, that Defendants were not entitled to receive the vast majority of the proceeds of the Sale.  It is therefore capable of obtaining judgment in the action commanding Defendants to disgorge many millions of dollars.  It is capable of demonstrating much of these millions are attributable to the Debtors' premier television production business, and to compete successfully with other claimants against that value.

## VI.    <u>CONCLUSION</u>

Wherefore, AI International respectfully requests that the Court enter an order denying Defendants' Summary Judgment Motion in its entirety and for all such further relief as is just and proper under the circumstances of these Cases.

DATED:   Wilmington, Delaware                    Respectfully submitted,
         October 5, 2018

                                        By:   */s/ Davis Lee Wright*
                                              Natalie D. Ramsey (DE Bar No. 5378)
                                              Davis Lee Wright (DE Bar No. 4324)
                                              MONTGOMERY MCCRACKEN WALKER &
                                              RHOADS LLP
                                              1105 North Market Street, Suite 1500
                                              Wilmington, DE 19801
                                              (302) 504-7828
                                              nramsey@mmwr.com
                                              dwright@mmwr.com

                                              Susheel Kirpalani (admitted *pro hac vice*)
                                              Scott Shelley (admitted *pro hac vice*)
                                              QUINN EMANUEL URQUHART
                                              & SULLIVAN LLP
                                              51 Madison Avenue, 22nd Floor
                                              New York, New York 10010
                                              susheelkirpalani@quinnemanuel.com
                                              scottshelley@quinnemanuel.com

                                              Bennett Murphy (admitted *pro hac vice*)
                                              Jennifer Nassiri (admitted *pro hac vice*)
                                              QUINN EMANUEL URQUHART
                                              & SULLIVAN LLP
                                              865 S. Figueroa St., 10th Floor
                                              Los Angeles, California 90017
                                              (213) 443-3668
                                              bennettmurphy@quinnemanuel.com
                                              jennifernassiri@quinnemanuel.com

                                              *Counsel to AI International Holdings (BVI) Ltd.*